Davis, Judge,
delivered the opinion of the court:
In the spring of 1959, plaintiffs , agreed with the Department of Agriculture to barter more than $6,600,000 worth of industrial diamonds for surplus cotton owned by the Commodity Credit Corporation (OCC). In this suit, they demand damages of $1,736,514.45, claimed to stem from the Department’s refusal to exchange its cotton on the basis of the average world market value of cotton, rather than a higher price desired by CCC. Charging that the agency’s actions contravened its statutory authority, plaintiffs sue for the money value of the additional cotton they say they should have received.
Congress, in 1954, authorized the Secretary of Agriculture to “barter or exchange agricultural commodities owned by the Commodity Credit Corporation for * * * such strategic or other materials of which the United States does not domestically produce its requirements * * * as the President may designate * * 68 Stat. 459, as amended, 7 U.S.C. § 1692. The statute also provided that the Secretary could “take reasonable precautions * * * to assure that barters or exchanges * * * will not unduly disrupt world prices of agricultural commodities or replace cash sales for *18 dollars.” Two years later, in an effort to stimulate lagging cotton exports, Congress directed tlie CCC “to encourage the export of cotton by offering to make cotton available at prices not in excess of the level of prices at which cottons of comparable qualities are being offered * * * by other exporting countries * * * [i.e., the world market price].”[1] Agricultural Act of 1956, § 203, 70 Stat. 188, 199, 7 U.S.C. § 1853. Until the latter half of 1958, CCC sold and exchanged cotton at minimum prices substantially equal to world market rates. The agency’s practice was to determine its prices in advance of each marketing year for cotton (which begins on August 1st and ends on July 31st), and to adhere to that pattern for the entire marketing year. In the fall of 1958, the rates established by CCC began to exceed those at which comparable grades of cotton were being offered by other countries. In keeping with its previous policy, however, the 'Department did not revise its prices until August 1, 1959.
On December 24,1958, 'CCC sent an announcement to the major dealers in industrial diamonds, inviting offers to exchange such materials for CCC agricultural commodities. Among the conditions stated were the requirements that the bartered commodities be exported, and that their sale be in addition to, rather than in replacement of, normal cash sales of CCC agricultural surplus. During the next month, plaintiffs Rough Diamond Company, Inci and A. G. Parser, Inc., New York-based industrial diamond concerns, offered to exchange surplus diamonds valued at approximately $6,700,000, in accordance with the specified conditions.[2] To be in a position to take advantage of the barter agreements which would follow acceptance of their offers, the plaintiffs made contingent arrangements with exporters for resale of the cotton.[3] These export agents agreed to purchase stipu *19 lated dollar amounts of government cotton at the CCC’s going rate, in the event that the plaintiffs’ bids were approved. After the execution of formal contracts by plaintiffs and CCC, the latter would refund the exporters’ cash payments to plaintiffs. Under their agreements with the exporters, plaintiffs would in turn remit to them discounts based on the cost of exporting and reselling the cotton, as well as the disparity between the anticipated world market price and CCC’s selling price during the 1958-1959 marketing year.
CCC conditionally accepted plaintiffs’ principal offers on March 16, 1959, agreeing to the terms specified in the bids other than the proffered export deadline (December 31, 1959), which was set by the Department at an earlier date (July 31, 1959). On March 20th, Eough Diamond and Parser wrote similar letters to the Barter and Stockpiling Division of the Commodity Stabilization Service (CSS),[4] requesting in effect that the cotton be exchanged at the world market rate, rather than at the higher price the Department was then receiving. After their counteroffers had been repeatedly rejected, plaintiffs accepted the Government’s terms and entered into agreements on that basis in late March and early April 1959. But when the contracts formalizing the agreement were to be signed in the fall of 1959, plaintiffs once again balked at Agriculture’s cotton exchange rate, insisting on the world market prices. After fruitless attempts to negotiate an adjustment with the Department, plaintiffs executed the contracts under protest, and thereafter brought suit in this court.
a. The principal claim is that Section 203 of the Agricultural Act of 1956, supra, commanded the Government to barter the cotton for plaintiffs’ diamonds at the world market price of cotton — and forbade any higher rate. As already noted, this section directed the CCC “to make [its] cotton available at prices not in excess of the level of prices at which cottons of comparable qualities are being offered * * * by other exporting countries * * *” The pri *20 mary purpose of this part of the statute is stated in the legislation itself, which declares that, “Such quantities of cotton shall be sold as will reestablish and maintain the fair historical share of the world market for United States cotton, said volume to be determined by the Secretary of Agriculture.” In attaining that goal, however, CCC was given some leeway, since it was also authorized to “accept bids in excess of the maximum prices specified herein [i.e., competitive world market prices],” although not permitted to “reject bids at such maximum prices unless a higher bid is received for the same cotton.” 70 Stat. 199, 7 U.S.C. § 1853.[5]
Passing over the Government’s substantive defenses that Section 203 did not apply at all to barters and did not, in any case, preclude an averaging of the world market price over a three-year period, we concentrate on the plaintiffs’ assumption that, once the court finds a violation of the statute, there is no escape from a judgment of recovery for them. This threshold postulate calls for inquiry. We can presuppose (without deciding) that the Department of Agriculture deviated from Section 203 when it pegged its cotton price above the current world level, but the probing question is whether that infringement should lead to an award of the additional monies paid by these purchasers for the CCC’s cotton.
*21 In a series of decisions growing out of the sale of government-owned vessels after World War II, this court held that buyers who had been charged more than the prices set by Congress could recover the excess, even though-they had entered into contracts to pay those higher, sums. A. H. Bull S.S. Co. v. United States, 123 Ct. Cl. 520, 108 F. Supp. 95 (1952); Southeastern Oil Florida, Inc. v. United States, 127 Ct. Cl. 409, 411-12, 414, 119 F. Supp. 731, 732-34 (1953), cert. denied, 348 U.S. 834 (1954); Clapp v. United States, 127 Ct. Cl. 505, 508-09, 513-15, 117 F. Supp. 576, 577-78, 581-82, cert. denied, 348 U.S. 834 (1954); Nautilus Shipping Corp. v. United States, 141 Ct. Cl. 391, 394-95, 158 F. Supp. 353, 354-55 (1958) ; Sprague S.S. Co. v. United States, 145 Ct. Cl. 642, 645-47, 172 F. Supp. 674, 675-76 (1959); Suwanee S. S. Co. v. United States, 150 Ct. Cl. 331, 333, 279 F. 2d 874, 877 (1960). The holding was that the parties could not, by agreement, change the terms prescribed by the statute for, the sale of the ships. This was said to be so even where the purchaser had freely agreed to pay the greater amount, and even though the maritime agencies could have withheld the ships from sale. Judgments were entered for the excess.
The Supreme Court had earlier been faced with a similar problem when a vendee of federal land paid considerably more than the statutory price for. some acreage. The Court ruled that the over-payment was voluntary and the payer had no claim, cognizable in this court, for the extra. United States v. Edmondston, 181 U.S. 500 (1901). In the ship-sale cases, we distinguished Edmondston by stressing the difference in the underlying legislation. The maritime statutes, we thought, embodied the Congressional wish that “the Government’s surplus ships should be sold at prices, uniform for all purchasers, and ascertainable by mathematical application of the statutory formula, properly interpreted”; this Congressional purpose “was strong enough to override any general legal doctrine, applicable in other situations, but which, if applied in the instant situation, would result in different persons paying different prices” for the same type of ships. In Edmondston, we said on the other hand, “the Supreme Court did not find a Congressional purpose that *22 land should be sold at the prices fixed by statute sufficiently strong to overcome the general legal doctrine relating to voluntary payments made under mistake of law.” Sprague S. S. Co. v. United States, supra, 145 Ct. Cl. at 646-47, 172 F. Supp. at 676. See, also, Suwanee S. S. Co. v. United States, supra, 150 Ct. Cl. at 337, 279 F. 2d at 877. As this court saw it, the basic test in deciding whether a purchaser could recover would always be the particular Congressional will reflected in the particular piece of legislation under scrutiny: “* * * a court, in the application of a statute, cannot evade the task of ascertaining as best it can, and then giving effect to, the Congressional purpose.” 145 Ct. Cl. at 646, 172 F. Supp. at 676.
Utilizing that basic yardstick, we seek the Congressional purpose of Section 203 as it bears on the right of these cotton-purchasers to recover a payment above the world market price. A capital contrast between the ship-sales statutes and Section 203 is that, in the former, Congress’s establishment of the sale price-formula was evidently for the benefit of the purchasers themselves — the very persons who brought suit to regain the excess payments they had made or agreed to make. The class Congress had in mind comprised those who sought to enhance the country’s merchant marine by buying surplus government vessels; they were to be helped by the sale of the ships at prices Congress considered fair and reasonable. In that way the American merchant fleet would be strengthened. The purchasers, potential and actual, were thus the direct beneficiaries of the legislative concern and interest. When they were charged more than Congress wished to have them pay, Congress would desire, the court felt, that they be reimbursed so that their ultimate price would not go beyond the moderate, uniform, level set by the statute. Recovery by the buyers of the excess would not be a windfall or unanticipated largesse, but rather a scaling down of the sale price to the maximum figure Congress wanted them to pay.
Section 203, on the contrary, was designed to benefit American farmers, not cotton exporters or merchants (like plaintiffs) who might seek to exchange cotton for diamonds (or other commodities). The goal of the provision was to aid *23 the farmer by enabling more domestic cotton to be sold abroad; the device of ordering sales to be made at the world price was but a means of increasing the distribution of the American product for the benefit of the American grower. Congress was not concerned with the welfare of exporters or commodity dealers per se, nor would it be primarily interested in the price they would have to pay for CCC cotton. So long as the proper share of domestic cotton reached the channels of international trade, Congress would be satisfied. It would not care that the exporter or the diamond dealer had to pay more than the world price.
This Congressional regard for the producer, rather than the exporter, is manifest on the surface of Section 203. The Secretary of Agriculture is told to sell such quantities of cotton abroad “as will reestablish and maintain the fair historical share of the world market for United States cotton” (as he determines it to be). This build-up of exports would be accomplished, Congress expected, by “encourag[ing] the export of cotton by offering to make cotton available at prices not in excess” of the world level. But as if to indicate that the increase in exports was its central concern, not the price at which the cotton was sold, Congress simultaneously provided that the CCC “may accept bids in excess of the maximum prices specified herein [the world market price] but shall not reject bids at such maximum prices unless a higher bid is received for the same cotton.” Provided that the cotton was sold, the CCC could lawfully obtain any amount the buyer was willing to give. The important thing was to expand exports so that, ultimately, the domestic farmers could receive a better and less costly return for. their production.
The same notes were sounded in the Congressional debates. Section 203 was a composition of the Senate committee, after the bill (H.R. 10875) had passed the House. S. Rept. No. 1966, 84th Cong., 2d Sess., pp. 2, 7; 102 Cong. Rec. 8350-1.[6] The provision permitting sales above the world price (under *24 defined conditions) was not included in the Committee’s version of the section but was added on the floor. Nevertheless, the Committee’s report emphasized the end of sales-expansion (as distinct fr,om the means of sale at the world price) by observing that “such quantities [of cotton] would be required to be sold as would reestablish the United States fair share of the world market.” S. Rept. No. 1966, supra, at 2. In initially sponsoring Section 203 ('before the proviso was added), Senator Ellender, also stressed the need to increase exports: “The experience of recent weeks demonstrates that only nominal amounts of cotton will be sold under the present export program. Competitive pricing is the key to increased cotton exports, and American cotton must be permitted to move freely into world trade.” 102 Cong. Rec. 8347. Immediately after the proviso was first adopted,[7] Senator Eastland said: “The charge has been made that the bill places a ceiling on the price at which cotton can be sold. That criticism is eliminated by the amendment.” 102 Cong. Eec. 8484. And he voiced his concern that “the American cotton farmer be permitted to sell on a competitive basis * * * so as to enable us to retain a fair share of our export business”, anticipating the reestablishment under the new measure of “the historic share of the American export cotton market for the American farmer * * Ibid (emphasis added) .[8] Other Senators expressed a similar concern with the impact on the farmer of then-current cotton export policies and the necessity, from the cotton-growers’ viewpoint, to expand exports. 102 Cong. Rec. 8485 (Sen. Young); 8486-7 (Sen. Stennis) ; 8488 (Sen. Goldwater). In accepting Section 203, the House conferees likewise emphasized that the goal was the recapture of our portion of the world market: “It is hoped that the Secretary can regain the historical American share of the world market without unnecessarily lowering the level of world prices for cotton, and it is not intended that he shall be required to drastically reduce *25 the price of cotton far below the level of prices received at the sale announced August 12,1955. On the other hand, it is intended that he shall have ample authority to reduce prices to whatever level he finds necessary to accomplish this result.” H. Rept. No. 2197, 2d Sess. (reprinted at 102 Cong. Eec. 8822).[9] The same theme'of the need to expand exports in order to help the domestic grower was repeated when the House accepted the conference report. 102 Cong. Rec. 8826-7 (Rep. Poage).
Throughout the consideration of Section 203, the main objective was to sell a fair share of American cotton. If that could be done only at the going world price the Secretary was to proffer the cotton at that rate, but if enough sales could be made at a higher level Congtess did not forbid receipt by the CCC of the increment. There were, of course, references in the debates to the world rates as the prices the Agriculture Department would charge (see, e.g., 102 Cong. Rec. 8347, 8483-87), but the presupposition always was that this was the means by which this country would regain its “historical share” of the cotton market. The prices were not the end in themselves.
From all of this we infer that the driving force behind Section 203 was to give a benefit to the farmer through increased exports — not a direct concern with the prices paid by cotton exporters or barterers. To allow these plaintiffs to recover the excess over the world price (assuming that the Agriculture Department departed from the statute by insisting on a higher minimum) would not be to give them the price Congress wanted them to pay but, rather, would permit the purchasers to reap a benefit which Congress gave no indication of wanting them to have for themselves. The beneficiaries on whom Congress focussed were another group altogether. For the same reason, it would not advance the Congressional goal to reduce, in 1965, the price these plaintiffs paid for their cotton in 1959 — as it helped to fulfill the aim of the ship-sale statutes for this court to lower, through the ship-sale litigation, the prices paid by those plaintiff-purchasers for their vessels.
*26 The result is that these exporters and barterers are in the position of individuals affected by a statute without being granted litigable rights under it because it was not enacted for their advantage. Cf. Perkins v. Lukens Steel Co., 310 U.S. 113 (1940); United States v. Binghamton Constr. Co., 347 U.S. 171, 176-77 (1964). As persons outside the circle of beneficiaries Congress drew for Section 203, purchasers of CCC cotton are bound by the traditional rules precluding recovery of monies voluntarily paid to the Government under mistake of law (United States v. Edmondston, supra), and holding contractors to the prices they have agreed to pay for federal merchandise (even though they might have obtained better terms by following other routes). See American Smelting & Refining Co. v. United States, 259 U.S. 75, 78-79 (1922); Matson Navigation Co. v. United States, 284 U.S. 352, 357-58 (1932); Parish v. United States, 8 Wall. 489, 490 (1869). Any protests plaintiffs may have uttered at the time of or after they closed the bargain cannot alter the effect of their voluntary agreements to exchange their diamonds at the CCC price for cotton. See American Smelting & Refining Co. v. United States, supra, 259 U.S. at 79; International Contracting Co. v. Lamont, 155 U.S. 303, 309-10 (1894); Gilbert & Secor v. United States, 8 Wall. (75 U.S.) 358, 359-60, 360-61 (1869); Parish v. United States, supra.[10]
It is particularly appropriate that these plaintiffs be bound by the pacts they made in full awareness. The eye of their interest was not the- export price of CCC cotton but the disposal of their stocks of industrial diamonds for dollars. They knew from the outset that the Department’s price for cotton exceeded the world level; their arrangements were initially made on that basis; and, in the beginning, they plainly entered into the exchange on the Department’s price terms. They did, thereafter, request that the barter be at the world market price, but when the Government refused they nevertheless confirmed (in effect) the existing informal agreements although they could have withdrawn at that stage without incurring any statutory or contractual penal *27 ties. As detailed in Part B of this opinion, infra, they were not misled by the Government or subjected to economic duress. On the contrary, they were so anxious to complete the barter (in order to dispose of their diamonds) notwithstanding the less favorable exchange rate that they in fact proceeded, and would in any event have proceeded, with the transactions despite the Department’s policy. They never expected to make any profit on the cotton part of the barter; the cotton was simply an intricate device for converting their diamonds into dollars. They could just as well have selected others of the many CCC-commodities which the Agriculture Department was offering for barter. Unlike the ship-buyers with whom this court dealt in the earlier cases, purchasers of plaintiffs’ type can hardly say that Congress clearly intended, through Section 203, that they should be charged no more than the world market price for cotton even though they had freely agreed with the Government to pay more.[11] Section 203, in other words, did not override the general legal doctrines applicable to monetary suits by those who have voluntarily purchased property from the Government.
b. Plaintiffs seem to argue alternatively that, in any event, the contracts should be reformed to reflect a cotton exchange rate based on the world market price because these agreements resulted from misrepresentation and coercion by the Government. They contend that they would have abandoned the negotiations had they not been misled into believing they might be able to exchange their diamonds for cotton priced,at competitive world rates. But, as we have already indicated, the trial commissioner has found that “plaintiffs were so anxious to dispose of their large surplus diamond inventories * * * that they would have proceeded with the transactions in any event.” Finding 41. In effect, the commissioner determined that plaintiffs were intent on completing the barter notwithstanding a less favorable exchange rate, and that they did not rely on allegedly misleading govem *28 ment statements concerning that rate. Although the plaintiffs challenge this ultimate finding, they do not attack any of the commissioner’s preliminary findings which lead up to his conclusion, i.e. that plaintiffs were well aware of the disparity between world market prices and the floor price for CCC cotton (finding 11) ; that they made their initial offers and arranged to pay substantial discounts to cotton exporters on the basis of the higher rate (findings 11,12,13, 16); and that they were concerned to dispose of their surplus diamonds even though they suffered such ostensible losses (finding 11).
We think that the defendant made no misrepresentations, and that even if Rough Diamond and Parser were temporarily misled by the statements in question they did not rely thereon to their detriment. On February 3, 1959, officials of the Department of Agriculture testified in hearings before a House subcommittee on appropriations, at which the Department was severely criticized for allegedly failing to comply with Section 203 during the 1958-1959 marketing year. The chairman of the subcommittee stated explicitly that he thought the pricing policy for 1958-1959 violated the statute. In the next two days, the Department of Agriculture issued press releases announcing changes in the CCC’s cotton export program for the 1959-1960 marketing year (beginning August 1, 1959). The revisions were designed to enable CCC to sell its cotton at world market prices. On the basis of these statements, plaintiffs apparently concluded that there was a strong possibility that, even prior to the end of the 1958-1959 marketing year, CCC would lower its cotton export prices. See finding 21. But it is difficult to see anything misleading about either the hearing-testimony or the subsequent press releases. At no time did the Department state that it would modify its cotton prices prior to July 31st, although such an inference might possibly be drawn from admissions at the hearings 'by representatives of the Department that the pricing policy for 1958-1959 had gone somewhat awry. See findings 15, 17. This is, however, far short of the “clear and convincing” evidence of misrepresentation necessary for the reformation *29 of a contract. Associated Traders, Inc. v. United States, 144 Ct. Cl. 744, 749-50, 169 F. Supp. 502, 505-06 (1959). Plaintiffs simply drew their own inferences from official statements which were, at most, ambiguous and murky.
Even if these pronouncements were misleading, Parser and Rough Diamond could not possibly -have relied on them. On March 16,1959, CCC “accepted” plaintiffs’ offers, but varied the terms by specifying an earlier export deadline.[12] While plaintiffs had proposed to export the bartered cotton by December 31, 1959, CCC stipulated that all cotton be exported on or before July 31,1959. Since plaintiffs had made extensive commitments with cotton brokers based on rates above the world market level, it can be assumed that they did not originally consider the world market price to be essential or the later deadline to be a means of obtaining that price. But as a result of the press releases in February 1959, plaintiffs knew that, as of August 1, 1959, CCC would lower its prices to approximately the going international rate. The selection of the export deadline then became important because it could permit the purchase of the CCC cotton at the lower rate. On March 20th, plaintiffs tendered counteroffers, requesting that the deadline be set forward to March 16, 1960, or, alternatively, that cotton received in exchange from CCC prior to July 31, 1959, be valued “in accordance with Section 203 of the Agricultural Act of 1956” (by which plaintiffs meant current world market prices). On the very same day, however, Parser sent a “confirmation” (acceptance) letter, agreeing to exchange diamonds valued at $135,000 on CCC’s terms. At conferences with Department of Agriculture representatives on March 24th, 25th, and 26th, and April 3rd, plaintiffs’ proposals were rejected. Findings 22,23(d), 24, and 25(a). Moreover, plaintiffs were told at these meetings that, to be considered, their revised offers would have to be treated as new ones and placed at the bottom of the list, since offers were passed on in the order *30 in which, they were submitted. This might mean losing out entirely on the barter, because CCC had received numerous offers. Wanting to avoid such a result at all costs, plaintiffs agreed to make the exchanges on the basis of the then prevailing rate for CCC-owned cotton. In a letter dated March 25th, Parser “confirmed” (accepted) the part of the defendant’s March 16th offer it had left open by its earlier confirmation, and Rough Diamond followed suit on April 6th. Apparently because they had accepted these terms, plaintiffs never replied to a letter from CCC on April 8th, formally reiterating the agency’s rejection of plaintiffs’ counteroffers.
Plaintiffs now claim that CCC intentionally timed its formal reply of April 8th so that it would arrive after the specified deadline for acceptance of the agency’s barter offers. As a result, it is said, CCC deceived them into thinking their alternative proposals might still be accepted, even after plaintiffs had agreed to less favorable terms. But the meetings of March 24-26th and April 3rd, at which government officials flatly rejected plaintiff’s counteroffers, can have left no doubt on this score. Before Rough Diamond and Parser accepted the defendant’s terms, they had already been told quite specifically that there was no hope for a better cotton exchange rate at that time. Plaintiffs accepted the higher rates with full knowledge of the surrounding circumstances and were in no way deceived when they acquiesced in CCC’s terms.
Plaintiffs argue also that they consented to the terms stated in the Government’s acceptance letter of March 16, 1959, in order to avoid the imposition of severe fines by the defendant. Assuming that reformation is an appropriate remedy (rather than rescission, which plaintiffs definitely do not desire), they have failed to prove their case. There is no evidence of duress. First, the OCC rules then in effect seem to us to make it clear that prospective barterers were not subject to any penalty prior to their confirmation of the acceptance letters. See findings 19(a), 28; tr. 833-38. Even if the rules had so provided, they were published and plaintiffs would have been on notice as to any sanctions specified for the withdrawal of an offer. Perhaps most significant *31 is the absence of a scintilla of evidence that plaintiffs were concerned with the question of possible penalties if they backed out after March 16th. The record contains no indication that either Rough Diamond or Parser made any inquiries in this regard before submitting their confirmations. Plaintiffs’ main concern at that time was still to dispose of the surplus diamonds for which there was no other market. Even if their prior enthusiasm had diminished somewhat, plaintiffs remained anxious to complete the barter transactions and were not coerced into doing so.
In the fall of 1959, plaintiffs were asked to sign contracts formalizing the agreements reached in March and April. When they refused!, seeking the better exchange rate, CCC did “threaten” to impose fines if plaintiffs backed out of the deal. See finding 51. By that time, plaintiffs were already bound by their prior acceptances, in the spring, of CCC’s offers. See Restatement, Contracts § 26; Hunt & Willett, Inc. v. United States, 168 Ct. Cl. 256, 266, 351 F. 2d 980 (1964) ,[13] The Government’s offers had incorporated by reference certain sanctions which could be invoked by CCC if the private party accepted the offer and then subsequently breached the resulting barter agreement. See findings 18, 19. By suggesting that it might employ such sanctions, the defendant was not guilty of duress. It was saying no more than it would be free to exercise its legal rights. See, e.g., Electric Power Plants Corp. v. United States, 146 Ct. Cl. 98, 100, 173 F. Supp. 615, 616 (1959); Beatty v. United States, 144 Ct. Cl. 203, 205-07, 168 F. Supp. 204, 206-07 (1958). In short, plaintiffs were neither coerced nor misled. The end result of the negotiations was plaintiffs’ acceptance, in the spring of 1959, of a cotton exchange agreement based on prevailing CCC prices for the 1958-1959 marketing year. Having voluntarily agreed to these terms, Rough Diamond and Parser got what they ultimately bargained to receive, and they are entitled to no more. Cf. Austin Co. v. United States, 161 Ct. Cl. 76, 80-81, 314 F. 2d 518, 520, cert. denied, *32 375 U.S. 830 (1963); Helene Curtis Industries, Inc. v. United States, 160 Ct. Cl. 437, 445, 312 F. 2d. 774, 778 (1963).
Plaintiffs are not entitled to recover, and their petition is dismissed.
FINDINGS 03? FACT
The court, having considered the evidence, the report of Trial Commissioner Saul Richard Gamer, and the briefs and arguments of counsel, makes findings of fact as follows:
1. Plaintiffs are corporations organized under the laws of the State of New York, with their principal offices in New York City. They were, at all times material herein, industrial diamond concerns whose main business was the acquisition, classification and sale of industrial diamonds.
2. By letter dated December 24, 1958, the Barter and Stockpiling Division of the Commodity Stabilization Seirvice (CSS), United States Department of Agriculture (USDA), informed the major dealers in industrial diamonds, including plaintiffs, that Commodity Credit Corporation (CCC) would consider the exchange of a limited quantity of industrial diamonds for agricultural commodities which were owned by CCC and required to be exported. This letter provided in part as follows:
Subject: CCC Policy Governing Acquisition of Industrial Diamonds Under Barter
This is to inform you that the Commodity Credit Corporation is now in a position to consider barter offers of limited quantities of industrial diamonds, which is one of the materials approved by the President of the United States for acquisition through barter and announced by USDA Press Release dated November 14,1958. A copy of this press release, setting forth CCC’s general policies governing the barter program, is enclosed for your information. In addition, there are set forth below the policy and procedure pursuant to which CCC will consider offers of industrial diamonds.
It is emphasized that under present policy the main purpose of the barter program is the exportation of CCC-owned agricultural commodities in addition to those exported under cash sales. Therefore, an offer of any strategic and critical material, assuming of course that price and other terms and conditions relating to such materials are acceptable, merits consideration only when *33 it serves the purpose set forth above. Since it is now more difficult to export barter commodities in compliance with CCC’s policy looking toward additional exports under barter, the Commodity Credit Corporation, both in its own interest and in the interest of potential barter contractors, is trying to guard against a most undesirable situation where, in the light of the estimated capacity of available foreign markets to absorb barter commodities, there would be at any time too large a total value of commodities to be exported under barter contracts for which there is neither a sale nor commitment for exportation.
In the interest of orderly transaction of business, in consideration of the already heavy workload under the recently announced program, and in order not to exclude other materials from some proportionate participation in current barter transactions which can be concluded in furtherance of CCC program objectives, it is not the intention of the Commodity Credit Corporation to call for submission of offers of industrial diamonds by a certain date. Instead, as in the case of any other material, offers of industrial diamonds will be considered in the order in which they are received and on the basis of their merits. Since industrial diamonds are appraised by the Government, the attractiveness of an offer of this material depends mainly upon the proposed disposition of agricultural commodities and the degree and nature of a commitment for disposition of a named commodity to a named country of destination, in line with CCC’s program objectives. In addition to these general considerations, there are given below some further points which may assist you when submitting an offer of industrial diamonds in exchange for CCC-owned agricultural commodities for export to eligible destinations:
(1) It is the desire of the Commodity Credit Corporation to undertake this proposed procurement with the least possible effect on the industrial diamond market, and without depriving industrial users of their normal supplies of this material. Therefore, each offer must contain a statement that the material offered is considered in excess of the historic requirements of the offeror’s normal customers.
(2) Offers of industrial diamonds may be submitted at any time after the date of this letter, and all material offered must meet the requirements of National Stockpile Specification P-19, dated April 1, 1949, * * *.
*34 (3) An offer must show the estimated total value of material offered and may show the estimated caratage in each class.
(4) The proposed delivery period for industrial diamonds shall be stated in the offer but, except where very prompt delivery is offered, CCC reserves the right to propose a different delivery period in individual cases which it deems more in line with the total dollar value of material offered. A delivery period exceeding one year from dafe of CCC’s acceptance telegram cannot be considered in any event.
(5) CCC reserves the right to reject any and all offers or any part of any individual offers.
(6) Due to the nature of the proposed transactions, involving the exportation of agricultural commodities and the administrative expense of preparing and administering detailed contracts, it is hoped that even the smallest offers will still represent a quantity of agricultural commodities susceptible to exportation. * * *
(7) Prior to telegraphic acceptance by CCC, offers may be withdrawn in writing.
(8) Prior to inspection and acceptance, COG assumes no obligation whatsoever regarding material - offered.
(9) The following standard provisions of barter contracts are particularly being called to your attention:
a. The acceptability and exchange value of industrial diamonds offered will be determined by a Government appraiser or appraisers whose decision shall be final;
* * # * ip
d. CCC requires irrevocable letter of credit performance guarantee of one percent of the total value of stones offered to assure delivery of any diamonds which may be contracted for;
e. A barter contractor is responsible for selling and exporting agricultural commodities involved; and
i. A contract, if any, will be based on CCC’s customary provisions, will contain detailed provisions concerning points (a) to (e) above.
ip * * * *
This letter applied to cotton and several other agricultural commodities.
3. (a) By telegram dated December 26, 1958, plaintiff A. G. Parser, Inc. (“Parser”) wired an offer to exchange $1,245,600 in industrial diamonds available for delivery “starting second week of January, 1959, * * * providing *35 suitable agricultural delivery arrangements have been made by then.” The diamonds were listed in assorted lots in 10 classes and 65 subgroupings. The wire stated in part: “The carats and amounts offered in this proposal are clearly in excess of the normal and historic requirements of the customers supplied by our firm, for industrial diamonds.”
(b) The following day, Parser, by telegram dated December 27,1958, telegraphed a second offer of $300,000 in additional industrial diamonds “for delivery second week of January,” “to barter against surplus agriculture commodities.” The offer similarly stated: “We offer out of our own stock on hand and certify that these goods are in excess of the historic need of our regular customers * * *.”
4. By telegram dated December 31, 1958, plaintiff Bough Diamond Company, Inc. (“Bough Diamond”) offered to barter $4,740,000 worth of industrial diamonds for CCC-owned cotton. The telegram read in part as follows:
Beurlet December 24 we offer for barter out of our own stock on hand for immediate delivery approximately five million dollars industrial diamonds of following caratage and estimated values:
* * * * *
We certify (1) the entire amount offered is in excess of the historic requirements of our normal customers and was imported for barter purposes (2) the entire amount meets National Stockpile Specification P-19 (3) our total diamond import from England during period accumulation material offered herein greatly exceeds value this offering and inquiry of Customs Authorities New York Division will verify (4) all these diamond purchases were paid for in United States dollars. Being in excess our normal customers requirements we submit such purchases by this company generated additional purchasing power in England for agricultural commodities to be exported. Therefore we propose bilateral[1] barter transaction and we hold firm *36 commitments from United States cotton merchants to export cotton to England in dollar amount of CCC exchange value. We will supply you with verification of these commitments upon request. The CCC owned commodity received in exchange under this transaction will be exported no later than December 31, 1959. We agree other provisions your letter December 24. This offer void for acceptance no later than January 15, 1959.
5. By telegram dated January 2, 1959, Parser submitted additional information relative to its December 26, 1958, offer indicating in part that:
‡ ^ $
3-All the diamond purchases were paid for in U.S. dollars and originated in the Union of South Africa and/or Belgium thus creating additional purchasing power for U.S. commodities.
4-We have firm commitments from cotton exporters to export cotton to Belgium for a CCC exchange value of 875,000 dollars and to export cotton to the "Onion of South Africa for a CCC exchange value of 135,000 dollars, and we will supply with verification of these commitments upon request.
5-Our offer is good for CCC acceptance until we withdraw bid.
6-As our firm cotton commitments are, as of now, in total of 1,010,000 dollars and our offer of December 26, 1958 is in a total of 1,250,000 dollars we ask for the privilege to eventually increase our cotton commitments to 1,250,000 dollars.
7-We will submit later data supporting the contentions of the cotton exporters that without this special barter transaction the United States cotton would otherwise not be sold.
-6. Under section 303 of the Agricultural Trade Development and Assistance Act of 1954, as amended, 7 U.S.C. § 1692, the Secretary of Agriculture is authorized “to barter or exchange agricultural commodities owned by the Commodity Credit Corporation for (a) such strategic or other materials of which the United States does not domestically produce its requirements * * * as the President may designate * * * .” The section further provides that “In carrying out barters or exchanges authorized by this section, no restrictions shall be placed on the countries of the free world *37 into which surplus agricultural commodities may be sold except to the extent that the Secretary shall find necessary in order to take reasonable precautions to safeguard usual marketings of the United States and to assure that barters or exchanges * * * will not unduly disrupt world prices of agricultural commodities or replace cash sales for dollars.” In furtherance of these provisions, it has been the policy of the Secretary to require barter contractors proposing to export commodities to countries which might otherwise purchase such commodities for dollars, to establish that the proposed barter transaction will not unduly disrupt world market prices and will represent additional exports of such commodities over and above those which might reasonably be expected to be made. Such evidence of so-called “additionality” was required of the plaintiffs in connection with their offers.
7. By letter of January 7, 1959, Rough Diamond referred to its December 31, 1958, $4,740,000 proposal “involving the exchange of industrial diamonds imported from England for CCC-owned cotton to be exported to England, having an exchange value equal to the value of the industrial diamonds offered therein” and submitted five telegrams of commitments from the following U.S. cotton exporters, referred to as Rough Diamond’s “commodity agents”, to export cotton to England in the indicated amounts:
Stemberg-Martin & Co., Ine_$2,000, 000
W. D. Felder & Company_ 500,000
C. Itoh & Company (America) Inc_ 400,000
Cook & Co., Inc- 1,750,000
Volkart Brothers, Inc_ 90,000
Total- 4,740,000
The letter further stated:
Please note that these foremost cotton exporters have assured us that without this special barter transaction they would not be able to sell this cotton to importers in England because these importers are buying their cotton requirements elsewhere,. and that this barter transaction, if accepted by CCC, will assure greater export of U.S. cotton. (See attached telegrams.)
We are. also assured that sale of this cotton will not unduly disrupt world market prices and that under *38 present marketing conditions it will not displace U.S. dollar sales.
We call to your attention the fact that for the first three months of the current market year only 46,172 bales of U.S. cotton have been exported to England; whereas, for the same period during the last prevailing marketing year, export to England was 185,995 bales. This is a clear indication that importers are. buying cotton elsewhere and that this barter transaction will not displace additional U.S. marketing of cotton but will serve to recapture some of the business now going to other countries.
We urge that you accept our offer at the earliest possible moment so that this opportunity to export surplus cotton to England will not be lost.
Each of the enclosed five telegrams, all dated January 7, 1959, stated that it would not be possible to sell the indicated amounts of cotton in England without the barter transaction. The following statement in the telegram from C. Itoh & Company (America) Inc. was typical:
* * * The situation is such that we could not otherwise sell this cotton for shipment to England without the proposed barter transaction. Importers are buying other growths of cotton as reflected in official U.S. export figures. It is hoped that the OCC will accept your proposal and thereby assure an increase in cotton exports.
8a (a) Also by letter of January 7, 1959, Parser referred to its December 26, 1958, $1,250,000 proposal and its January 2,1959, telegram with respect thereto, and enclosed- “two (2) commitment telegrams and verifications from Cook & Company, Inc. and Volkart Brothers, Inc. [cotton exporters] showing that we have on hand firm commitments from reputable and large cotton exporters to ship cotton .to countries designated in the barter proposal.” The letter went on to state:
It is obvious from these telegrams that the cotton considered in this transaction does not displace any normal sales but, in view of the special barter conditions, would generate new sales for American cotton where, at present, this material is being supplied mostly from other countries. Thus the barter sales would not disrupt world market conditions nor would they replace normal U.S. Dollar sales.
*39 The enclosed commitment telegram, also dated January 7, 1959, from Cook & Co., Inc., to Parser, stated in part:
* * * Under present and projected marketing conditions we could not sell this U.S. cotton to importers in Belgium without this special barter transaction. Importers there are consistently buying their cotton requirements from other countries. Therefore this barter transaction, if accepted by CCC, will assure greater exports of U.S. cotton.
The enclosed telegram from Volkart Brothers, Inc., also dated January 7,1959, similarly stated that “Cotton marketing conditions at present preclude us from making sales of cotton to Union of South Africa without this barter transaction. Importers there are buying cotton elsewhere. CCC approval of your barter proposal would help increase exports U.S. cotton.”
(b) By another letter of January 9, 1959, relating to its December 26,1958 proposal, Parser forwarded two more commitment communications from two additional cotton exporters [Hohenberg Bros. Company and Stemberg-Martin & Company, Inc.]. Parser’s letter repeated the above-quoted portion of its January 7, 1959, letter and then added:
The CCC-owned commodities received in exchange for the industrial diamonds will be exported no later than December 31, 1959.
(c) All the additional offers made by Parser, as will hereinafter appear, were similarly supported.
9. By telegram dated January 26, 1959, Parser wired a third offer “of $700,000 of industrial diamonds to be bartered against agriculture products”, the diamonds to “be available for delivery three weeks after acceptance of our offer.” The telegram further stated that plaintiff had “firm commitments for the amount of $300,000 from Cook & Company for cotton to be exported to the Netherlands and also for $400,000 from C. Itoh (America) Inc. for export to Belgium.”
10. In January 1959, the Foreign Agricultural Service, USDA, issued a publication entitled “Factors Affecting the Export Outlook for United States Cotton Production and Export Availabilities” in which it was noted that cotton production was increasing in many foreign countries al *40 though it was decreasing in the United States; that “price behavior” would “have an important bearing on the future of cotton in general”; that there was “evidence in recent years that the U.S.S.R. and Communist China can trade in cotton * * * in a manner that has a most demoralizing effect upon world prices and trade”; and that the “ability and willingness of these countries to make use of cotton * * * as a political and economic weapon is disconcerting * * The publication closed as follows:
Since the legislation requiring that U.S. cotton be available for export at competitive prices [section 203 of the Agricultural Act of 1956] continues in force, there should be no doubt in any quarter, either at home or abroad, that the United States expects to maintain a strong position in the export market. The overall policy is quite clear. If ambiguity exists, it is not with respect to the general cotton export policy of the United States but only with respect to the details of implementation.
11. Although there are approximately 400 grades of cotton, each bearing its own price at different locations, nevertheless at the time of defendant’s December 1958 barter invitation and plaintiffs’ subsequent offers, the prices at which many grades of cotton were being offered in various world markets, including England, by other exporting countries were generally approximately 5 to I cents per pound lower than the prices at which comparable growths of CCC-owned United States cotton was being offered in those markets. Such competitive disparity continued to exist in at least such amount throughout the remainder of the then current marketing year, i.e., until July 31, 1959.
At the time plaintiffs made their offers and selected cotton for their barter commodity,[2] they were familiar with the then current price disparity. However, plaintiffs’ representatives had, especially through Rough Diamond’s previous barter transactions, become familiar with cotton commodity dealings and plaintiffs had confidence that their agents would be able to move the cotton in foreign markets. When the original offers were made, plaintiffs’ primary concern was *41 divesting themselves of their large surplus diamond inventory accumulations, amounting to many millions of dollars, in which problem they were much more interested than in the cotton competitive situation. Even prior to its December 1958 offer, and going back to 1957, Rough Diamond, in an attempt to dispose of surplus diamond inventory, had submitted barter offers on a continuing basis to CCC. However, prior to the instant ones, no acceptances had been made which resulted in plaintiffs’ having purchased any cotton from CCC during the 1958-59 marketing year.
12. The arrangements between plaintiffs and their agent cotton exporters were as follows: (1) The cotton agent agreed to purchase cotton from the CCC in the amount of the commitment within 45 days after notification that the CCC had accepted, and the plaintiff had confirmed, the barter transaction, provided that such acceptance and confirmation occurred on or before January 15, 1959. All of the commitments were good only to such date. (2) The cotton agent would pay cash for the cotton to CCC and would then notify CCC to make refund of such payments to the plaintiff. (3) When the plaintiff, after the execution of a formal contract with the CCC, received the refund of the cash payment, it would at that time remit to the cotton agent a discount in an amount provided in the commitment between the plaintiff and the cotton agent.
The amount of the discount was in large part predicated upon the level needed to make United States cotton competitive with foreign growths.
The original commitments obtained by Rough Diamond on December 28 and 30,1958, provided for discounts to the cotton agents in the following amounts: Volkart Brothers, 8 percent; Sternberg-Martin, 8 percent; Cook & Co., 10 percent; and C. Itoh & Co., 10 percent. (The discount allowed W. D. Felder & Company does not appear.) On January 5, 1959, the discount to Stemberg-Martin was increased to 10 percent.
13. (a) Section 203 of the Agricultural Act of 1956 (70 Stat. 199; 7 U.S.C. § 1853) provides as follows:
Sec. 203. Expoet Sales Program: Foe CottoN. In furtherance of the current policy of the Commodity *42 Credit Corporation of offering surplus agricultural commodities for sale for export at competitive world prices, tbe Commodity Credit Corporation is directed to use its existing powers and authorities immediately upon the enactment of this Act to encourage the export of cotton by offering to make cotton available at prices not in excess of the level of prices at which cottons of comparable qualities are being offered in substantial quantity by other exporting countries and, in any event, for the cotton marketing year beginning August 1, 1956,_ at prices not in excess of the minimum prices (plus carrying charges, beginning October 1,1956, as established pursuant to Section 40? of the Agricultural Act of 1949) at which cottons of comparable qualities were sold under the export program announced by the United States Department of Agriculture on August 12, 1955. _ The Commodity Credit Corporation may accept bids in excess of the maximum prices specified herein but shall not reject bids at such maximum prices unless a higher bid is received for the same cotton. Cottons of qualities not comparable to those of cottons sold under the program announced on August 12,1955, shall be offered at prices not in excess of the maximum prices prescribed hereunder for cottons of qualities comparable to those of cottons sold under such program, with appropriate adjustment for differences in quality. Such quantities of cotton shall be sold as will reestablish and maintain the fair historical share of the world market for United States cotton, said volume to be determined by the Secretary of Agriculture.
(b) The CCC marketing year for cotton commences on August 1 and ends on July 31.
Under the cotton export program, CCC sold cotton at not less than a minimum price which it established. Since August 1, 1956, and until the early part of the 1958-59 marketing year, these minimum prices were such as to enable United States cotton to be offered in world markets at prices substantially equal to the level of prices at which cotton of comparable quality was being offered in substantial quantity in such markets by other exporting countries. However, after the first few months of the 1958-59 marketing year, the prices at which most grades of cotton were being offered in world markets by other cotton exporting countries became lower than the prices at which comparable growths of CCC- *43 owned cotton could, considering COC’s minimum price, be offered and were being offered. As stated, by December 1958 the discrepancy was, in many cases, 5 to 7 cents per pound.
To promote the export of United States cotton privately held, defendant made export payments to exporters. For the 1958-59 marketing year, such payment was fixed at 6.5 cents per pound. The amount of the payment which would become effective on August 1, the beginning of the marketing year, was customarily announced approximately 4 to 6 months in advance in order to permit the exporters to make necessary export arrangements. Prior to the 1958-^59 marketing year, there had never been any change made during a marketing year in the previously announced export payment, although it was the USDA’s prerogative to do so. The amount of the payment previously fixed and announced was maintained throughout the year without any attempt at daily, weekly, or monthly adjustments to keep all grades of United States cotton finely competitive at all times in the various world markets (as was done, for instance, with wheat, for which daily adjustments were made). The principal reason for maintaining the same price throughout a marketing year was the belief that such a policy would contribute to price stability which in turn importantly affects cotton consumption. The introduction of uncertainty into the price structure might result, USDA felt, in the export of less cotton because the cotton merchants, in the constant expectation of lower prices, might refrain from bidding and purchasing. However, prior to the 1958-59 marketing year, there had been, as pointed out, no substantial need for such frequent adjustments.[3]
*44 Similarly, ever since the commencement of the cotton export program on August 1, 1956 under section 203 of the Agricultural Act of 1956, there had not been any changes made during any marketing year in the minimum prices CCC had established for the sale of CCC-owned cotton for export, although it was similarly its prerogative to do so. However, unlike the situation pertaining to the announced amount of the export payment, the minimum price which CCC fixed for the sale of its cotton for export during a marketing year was never previously publicly announced. Despite this failure to disclose, however, cotton merchants were, under the established procedure for the sale of such CCC-owned cotton by competitive bids (as authorized by section 203), quickly able to ascertain, within the first month of the marketing year, what CCC’s floor price was. By “ranging” their bids on the first two bid openings (sales being made, and bids being opened, every 2 weeks), bidders were thus able to determine what the floor price was, since no bids below such price were accepted. In early May 1958, the Secretary of Agriculture, through administratively confidential action, established a minimum base price of 28.30 cents per pound for middling 1-inch cotton at average location for the marketing year commencing August 1, 1958.[4] At the time defendant requested barter proposals in December 1958, this base price was well known by cotton merchants. After each *45 biweekly bid opening, tbe New Orleans office of CSS issued press releases stating specifically what the average price at which cotton was sold during the period (on the basis of middling 1-inch cotton at average location). In every instance during the then current marketing year the average selling price was slightly in excess of 28.30 cents per pound. As a result, virtually all the offers received by CSS during the 1958-1959 marketing year were based on that price. The discounts in the cotton merchants’ commitments to plaintiffs were based on such 28.30-cent price and the deductions therefrom that would have to be made to make it competitive in world markets. While, in view of the Secretary’s right to change the price at any time, no one could be absolutely certain as to what the base price would be at the next bid opening, the knowledge as to such base price being based only on past bid openings, the discounts were in fact based on such price and the assumption, grounded upon the theretofore consistent Departmental policy and practice of maintaining the same floor price throughout the entire marketing year, that the past 28.30-cent floor price would be maintained throughout the current marketing year.
(c) There is no official, published “world price” of cotton, although in the trade the expression “world price” is frequently employed. When so employed, it commonly refers to a composite or average of prices in various foreign markets on one base type of cotton, such as the strict middling l%6-inch grade (the base type purchased in Liverpool, England) .[5]
14. (a) The procedure for the acquisition of cotton from CCC for export under barter transactions was, during the period herein involved, governed and prescribed by two so-called CSS “Announcements”, each dated April 23, 1958. One, designated “Announcement CN-EX-5” and entitled “Cotton Export Program — Sales”, was issued by the Director of the Cotton Division in Washington. The other, designated “Announcement Number NO-C-11” and entitled “Sale *46 of Upland Cotton (Cotton Export Program 1958-59 Marketing Year) ”, was issued by the New Orleans office.
Announcement CN-EX-5 provided in part:
I. General
Commodity Credit Corporation (hereinafter referred to as “CCC”) will make available for sale upland cotton from its inventories acquired in price support operations for export pursuant to the terms and conditions of this announcement. Sales will be made on a competitive bid basis through the CSS Commodity Office, Wirth Building, 120 Marais Street, New Orleans 16, Louisiana (hereinafter referred to as the “New Orleans office”). The New Orleans office will issue a sales announcement (identified as Announcement Number NO-C-11) which, together with this announcement, will contain the terms and conditions under which the cotton will be sold and exported. * * * CottoN Cannot Be Exported Under the Program:, Prior to August 1,1958.
II. Export Conditions
A. Exportation of Gotton. All cotton sold hereunder is sold upon the condition that the purchaser exports or causes to be exported to a destination * * * outside the continental United States either the identical bales of cotton purchased from CCC or in substitution therefor an; equal quantity of cotton (the cotton exported or caused to be exported by the purchaser is hereinafter referred to as “the cotton”). * * *
While the purchaser may arrange to have some other person or firm export the cotton, the responsibility for such exportation cannot be transferred. CCC will hold the purchaser solely responsible for its export. Satisfactory evidence of exportation of the cotton must be submitted by the purchaser. If the purchaser causes the cotton to be exported by some other person or firm, the purchaser must have sold the cotton to or through such person or firm so that the cotton would be exported.
Cotton exported hereunder shall not be cotton exported pursuant to any program of the Department under which a payment in kind or cash export payment has been or will be made * * *.
B. Exportation of Substitute Gotton. If other than the identical bales of cotton purchased from CCC are exported in fulfillment of the export requirements of this announcement, the unpatchea gross weight of the cotton exported (including any identical bales in the shipment) must equal the gross weight of the cotton *47 purchased from CCC. Cotton exported in substitution must be of grades within the universal standards for American upland cotton, must have a staple length of 13Aq' or longer, must have been produced in the continental United States, and must not be reginned, loose, or pickery cotton or any other such irregular cotton.
U. Time for Export. The cotton must be exported on or after August 1, 1958, and not later than (1) 9 months after the date the warehouse receipts covering the cotton purchased from CCC are made available to the purchaser or such cotton is delivered by CCC to the purchaser, or (2) July 31, 1959, whichever is earlier. iotton exported in substitution for cotton purchased from CCC hereunder must be exported after the date of purchase of such cotton from CCC.
$ $ $ $ $
IV. Price Adjustment
CCC sells cotton for unrestricted use at not less than the statutory minimum sales price for sales for unrestricted use (105 percent of the current support price for such cotton plus reasonable carrying charges) or the domestic market price, whichever is the higher. Sales of cotton by CCC for export are not subject to the statutory price restriction. Sales of cotton under this program may be made at reduced prices and are made upon the condition that the purchaser exports or causes to be exported in conformity with the requirements of this announcement either the identical bales purchased or in substitution therefor an equal quantity of cotton. * * *
(b) Announcement NO-C-11 provided in part:
Commodity Credit Corporation (hereinafter referred to as “CCC”) has issued Announcement CN-EX-5 announcing a Cotton Export Program under which it will make available for sale, for export on and after August 1, 1958, upland cotton acquired in price support operations and listed in the catalog. The CSS Commodity Office, New Orleans, Louisiana, announces that it will consider for CCC offers to purchase cotton for export under Announcement CN-EX-5. Cotton available for sale is listed in the catalog. This announcement and Announcement CN-EX-5 contain the terms and conditions under which the cotton will be sold and exported under the Cotton Export Program.
* * * * *
4. (a) The cotton will be invoiced on receipt weights and on the basis of the classification of the cotton as *48 listed in the catalog. * * * Delivery and payment shall be made by sight draft with invoice and warehouse receipts attached unless * * * (2) cotton is being delivered under a barter contract entered into by CCC. * * * Delivery under a barter contract will be in accordance with the terms of such contract. * * *
It was further provided that competitive bids would be received by the New Orleans CSS Commodity Office from time to time throughout the 1958-59 marketing year. Such bids could be made by interested cotton merchants on lots or portions of lots of cotton listed in the CCC catalog. Bids were required to state the price in cents per pound that such merchants were willing to pay for cotton for export of the class and staple length and at the various locations described in the catalog. These bids on opening would then be compared by personnel of the New Orleans CSS Commodity Office. The first bid opening for the 1958-59 marketing year which commenced on August 1, 1958, was set for May 12, 1958, and bid openings were provided for every 2 weeks thereafter. (In practice, following acceptance by CCC of a bid, a confirmation of sale was issued to the purchaser setting out the sales number assigned to the purchase from which a part or whole of the cotton so acquired could be allocated to one or more barter contracts.)
The Announcement closed with the following:
12. In submitting an offer under this announcement, the offeror represents and warrants that he is regularly engaged in the business of buying or selling commodities and for this purpose maintains a business office in the United States, its territories, or possessions including Puerto Rico and therein has a person, principal or resident agent, upon whom service of judicial process may be had. CCC reserves the right to determine the eligibility of any offeror.
(c) The issuance of these two Announcements was accompanied by a USDA Press Release, also dated April 28, 1958, and entitled “USDA Announces 1958-59 Cotton Export Programs.” The release stated in part:
The U.S. Department of Agriculture announced today that a cotton export sales program similar to the current *49 program will be in effect during the 1958-69 marketing year, and that it will be supplemented by a “payment-in-kind” program to encourage exports from commercial stocks.
Under the program now in effect, Government-owned cotton is offered for export sale at competitive-bid prices. Under the supplemental payment-in-kind program, payments in the form of cotton from Government stocks will be earned by export shipments of cotton from commercial stocks.
¥ «í» 'i*
CCC inventory stocks are now reduced to less than 1.4 million bales. Some of these stocks will be sold for unrestricted use. Under these conditions, a supplemental export program drawing on commercial stocks is necessary in order to maintain a fair historical share of the world cotton market for the United States.
15. (a) On February 4 and 5, 1959, the USDA issued press releases announcing the Cotton Export Program for the 1959-60 Marketing Year, which was to commence August 1, 1959. The February 4, 1959, press release provided as follows:
USDA Announces Cotton Export Program for 1959-60 Marketing Year:
The U.S. Department of Agriculture today made the following announcements regarding cotton export programs for the marketing year which begins Aug. 1, 1959:
1. The payment-in-kind export program which has been in effect since the start of the current marketing year will be continued and expanded. Under this program, cotton for export shipment is drawn from commercial stocks, with the exporter earning dollar credits which he uses to buy other cotton from Commodity Credit Corporation stocks.
2. The initial rate of export payment under the payment-in-kind program will be 8 cents per pound for cotton shipped on or after Aug. 1, 1959. This rate will be subject to change without prior announcement. The payment rate under the current payment-in-kind program is 6.5 cents per pound. However, the effect of the announced payment rate for next year, in making United States cotton competitive on world markets, will be increased by a greater amount than indicated by the dollars-and-cents difference from this year’s rate. The domestic price at which exporters will be able to buy *50 cotton from commercial stocks is expected to be materially lower than this year.
3. The “direct sales” program, which has been in effect since 1956 and under which CCu-owned cotton is offered for export sale at competitive-bid prices, will be discontinued at the beginning of the marketing year which starts Aug. 1, 1959. Cotton will be drawn from CCC stocks only for the payments-in-kind under the export program, for barter, for credit sales, for donations, and any emergency operations.
The payment-in-kind program which is being continued for next year permits greater participation in the merchandising of cotton by the various segments of the cotton industry, from the country merchant to the futures exchanges. It lessens Government control over the marketing of cotton, and serves to concentrate export demand on commercial or “free market” stocks.
Department officials explain that it is their intention to keep United States cotton in a competitive position on world markets. To achieve this objective, the initially announced export payment rate may be adjusted from time to time during the year in line with developing conditions. The effective payment rate will be under constant study, with a full review at least once a month.
The announcement containing the terms and conditions of the export program is now being developed. Copies of such announcement will be made available as soon as development work is completed, so that exporters and others in the cotton industry will be in position to plan ahead for operations in the new marketing year.
(b) The February 5 press release stated in part:
In response to inquiries about possible cotton export programs after the present marketing year, the U.S. Department of Agriculture today expanded and clarified the announcement of the cotton export program which was issued yesterday, Feb. 4.
* * * * *
In connection with the above announcement, Department officials explain that there is a definite responsibility on the Department and the cotton trade to make the cotton export program work to the extent of reestablishing and maintaining the fair historical share of the world market for United States cotton, as required by law. If the payment-in-kind program does not prove effective, with reasonable export payments, the Depart *51 ment will be required to reinstate a competitive sales program (from CCC-owned stocks) to the point of reestablishing and maintaining “the fair historical share of the world market.”
Department officials also called attention to the fact that during the marketing year which begins Aug. 1, 1959, the Commodity Credit Corporation will offer cotton owned by it for sale for unrestricted use at not less than 10 percentum above the current level of price support effective for Choice B cotton under the alternate price-support programs available in 1959.
16. The original commitments from the cotton merchants to Rough Diamond having expired (no action having been taken as yet by CCC on plaintiffs’ offers), the following new commitments for export of cotton to England were negotiated on February 12, 1959 at the following discounts: Vol-kart Brothers — $590,000—12 percent; Stemberg-Martin— $2,000,000 — 12 percent; Cook & Co. — $1,750,000—13 percent; and C. Itoh & Co. — $400,000—12 percent.
These commitments expired on February 28, 1959, and were subsequently extended first to March 16,1959, and then to March 31,1959.
■17. On or about March 4, 1959, a transcript of the hearings before the Subcommittee of the Committee on Appropriations, House of Representatives, 86th Congress, First Session, which had taken place on February 3,1959, was made public. These hearings involved testimony by the Secretary of Agriculture and other USDA officials on whether the USDA was, especially during the then current 1958-59 marketing year, complying with section 203 of the Agricultural Act of 1956 in making CCC-owned cotton available for export at prices competitive with foreign growths.
During the hearings, Congressman Whitten took the position that in the three marketing years since section 203 had been enacted, the USDA had complied with the law for the first two (1956-57 and 1957-58) but that for the then current year (1958-59) USDA had failed to comply, resulting in the loss of exports for American cotton. He felt that the Department was wrongfully refusing “to vary the subsidy on cotton” during the year, and pointed to the export sub *52 sidy on wheat which was changed daily in order to stay competitive. The Secretary conceded that the USD A was:
obligated to follow the law, which means that we are to be competitive in the world market and get our fair share of the world market but regardless of the conscientious manner in which we try to administer that law, there are bound to be some periods when we will be getting more than our share and other periods when we will be getting less than our share. You can’t fix it * * * we overshot the mark the first 2 years; we undershot it this year. But, averaging the 3 years out we have, I think, done a good job.
The Assistant Secretary testified that if the cotton subsidy to be set for the 1959-60 marketing year resulted in the United States share of the world market not being maintained, “that subsidy will be changed to maintain it,” but that in arriving at “the decision not to change this year,” the Department had “weighed tire 3 years” and had concluded “that for the 3-year period we have complied with the law because we have moved this much cotton. In the fourth year if we are not doing that we will take the steps necessary under the statute to carry it out.” In answer to Congressman Whit-ten’s question that: “If to carry out that law, if it takes a change in the subsidy rate, periodically, monthly, would you make those changes?”, the Secretary replied “Yes”, and that in the future the Department would “probably need to vary it within the year, possibly.” The Department’s General Counsel testified that “Of course, the law doesn’t require the impossible, * * * there is no place you can call up and get the world market for cotton”, that, although the Assistant Secretary and the Secretary “have admitted that at the present time cotton is too high, and they plan to change the basis”, nevertheless “I think there is á reasonable basis for finding that they have complied with the statute.”
18. (a) On March 16, 1959, CCC sent the following telegram to Parser with respect to Parser’s offer of December 26, 1958 (finding 3), as supplemented by its telegram of January 2, 1959 (finding 5) :
Beurtels 12-26-58 and 1-2-59, CCC accepts your offer of industrial diamonds from Belgium and Union South *53 Africa in exchange for CCC-owned cotton on the following basis:
(1) Value of stones deliverable from Belgium shall be $875,000.00 and from South Africa $135,000.00, one fourth of one percent more or less at your option.
* * * * &
(3) Exchange value of stones shall be determined in New York City by Government inspector during inspection period (s) to be established by CCC. Government inspector’s evaluation shall be final.
(4) In event evaluation by Government inspector is less than your estimated invoiced value, or in case of rejection of all or any part of material submitted for inspection and evaluation, you may, within 24 hours after such evaluation or rejection, substitute or add stones for, and to, stones inspected and appraised or withdraw stones submitted for inspection and evaluation. In the case of such withdrawal by you, the total value of stones covered by this telegram, and your obligation to export agricultural commodities, shall be reduced accordingly. To extent you may have taken commodities before any such withdrawal having value in excess of value of stones accepted, such commodities shall be considered as sold for cash.
Industrial Diamonds to be exchanged for CCC-owned cotton having exchange value of $875,000.00 which shall be exported to Belgium and having exchange value of $135,000.00 which shall be exported to South Africa. All cotton shall be exported on or before 7-31-59. Acquisition of cotton and provisional credit or settlement for diamonds delivered prior to contract execution will be in accordance with “Transactions Prior to Signing Barter Contracts” dated 5-SU58. This acceptance subject to execution mutually acceptable contract which will provide (a) U.'S. funds made available for' purchase U.S. agricultural commodities or as result of financing by any U.S. Government agency on sales of agricultural commodities for foreign currency may not be used as payment for cotton to be delivered under ensuing contract ; and (b) importation of cotton by such countries will not increase availability of cotton for export therefrom to unfriendly foreign countries. Please confirm within 10 days.
*54 (b) On the same day, March 16, 1959, CCC sent a similar telegram to Rough Diamond with respect to its $4,740,000 offer of December 31, 1958, advising that:
Reurtel 12-31-58, CCC accepts your offer of industrial diamonds from England in exchange for CCC-owned cotton on the following basis:
(1) Value of stones deliverable shall be $4,740,000.00 one fourth of one percent more or less at your option. * * * * *
and that:
Industrial Diamonds to be exchanged for CCC-owned cotton having equivalent total exchange value which shall be exported to England on or before 7-31-59. * * *
19. (a) The document referred to in the March 16, 1959, CCC acceptance telegrams entitled “Transactions Prior to Signing of Barter Contracts” stated as follows:

Transactions Prior to Signing of Barter Contracts

In instances in which Commodity Credit Corporation has accepted an offer from a contractor to barter materials for agricultural commodities, subject to the execution by the parties of a mutually agreeable contract containing all of the terms and conditions upon which such barter would be made, and the contractor has confirmed CCC’s acceptance, but negotiations for the contract have not been concluded, the contractor may acquire agricultural commodities from CCC for application against the proposed contract and receive provisional credit or settlement for materials delivered in accordance with the following terms:
A. The contractor may acquire any agricultural commodities available for barter, except as may be provided otherwise in CCC’s acceptance. The contractor shall acquire such agricultural commodities for export pursuant to the provisions of the CCC sales announcements offering such commodities for sale, except as provided herein. At the time of purchase of any such commodity (or within three business days after the time of purchase in the case of cotton), the contractor shall inform the CSS Commodity Office that the purchase (or a designated part thereof) is to be made applicable to the barter contract.
The contractor must either pay for such commodities in accordance with the applicable CCC sales announcements or, notwithstanding the provisions of such an *55 nouncements, if lie so elects, furnish, an irrevocable letter of credit in favor of and acceptable to CCC in an amount at least equal to tlie sales price of tlie commodities, provided the contractor has agreed to the provisions hereof. If agricultural commodities are delivered by CCC to the contractor against such a letter of credit, the contractor shall pay to CCC interest on the unpaid balance of the sales price of such commodities (at the rate applicable to CCC credit sales on the date such commodities are purchased) from the date the commodities are delivered until (1) the contractor delivers to CCC material (as specified in the offer and acceptance) which is retained by CCC having an exchange value (as determined by CCC in accordance with the offer and acceptance) equal to such sales price, or (2) payment for such commodities is otherwise effected.
B. If the contractor has delivered to CCC material (as specified in the offer and acceptance) in accordance with specific authorization by CCC, and in the absence of any information that such material is or may be unacceptable, CCC will advise the contractor, at his request, of a provisional credit for 90 percent of the exchange value of such material (as determined by CCC in accordance with the offer and acceptance). If CCC has received satisfactory proof of exportation by the contractor to a country satisfactory to CCC of agricultural commodities acquired against the proposed barter contract, CCC will also, on request by the contractor, release financial coverage for the total sales price of the commodities delivered but not to exceed 90 percent of the exchange value of the material delivered, by refunding cash (if the contractor paid cash for the agricultural commodities) or by notifying the bank that CCC consents to a reduction of the letter of credit (if the contractor furnished a letter of credit).
C. If negotiation of a mutually satisfactory barter contract is not completed and such contract signed by CCC and the contractor within a reasonable period of time, as determined by CCC: .
1. The acquisition by the contractor of any agricultural commodities hereunder shall have the status of a cash sale under the applicable sales announcement, and he shall promptly pay to CCC, in accordance with such announcements, the sales price of such commodities and any interest due under section A hereof, less any amount credited to the contractor’s account pursuant to item 2 below and less any amount previously paid and not refunded.
*56 2. CCC may, at its election, retain or reject, in whole or in part, any material delivered to it. If material is retained by CCC, the contractor’s account shall be credited with its exchange value, as determined by CCC in accordance with the offer and acceptance. If the material is rejected, the contractor shall promptly reimburse CCC for all costs incurred by CCC in connection with such material and remove such material. If identical material cannot be returned to the contractor, CCC may deliver and the contractor shall accept a quantity of like material having an equivalent value, as determined by CCC. Notwithstanding the foregoing, CCC may hold any rejected material as security for the payment of any amount due CCC from the contractor, and in the event CCC does not receive prompt payment of such amount, CCC shall have the right to sell such material and apply the proceeds against the amount due from the contractor.
May 2,1958
(b) The procedures set forth in the above document were grounded upon the frequent desirability of obtaining agricultural commodities for export before all negotiations for a formal contract had been concluded but after an exchange of correspondence evidencing substantial agreement on the barter deal. Thus, the CCC made provision, through this document, for the acquisition and export of the agricultural commodities prior to the actual signing of a formal contract.
20. Since plaintiffs construed the original CCC invitation of December 24, 1958, in a manner which might give them, if their offers were accepted, as long as one year after the date of such acceptance within which to export the agricultural commodities, plaintiffs became concerned about the requirement in CCC’s acceptance telegrams of March 16, 1959, that the large amount of cotton involved be exported by July 31, 1959. Further, OCC’s acceptance telegrams allowed plaintiffs only 10 days to confirm OCC’s acceptance. On March 18, 1959, Mr. Van Berg, Eough Diamond’s Vice President, and Mr. Herbert C. ITathorn, plaintiffs’ Washington representative on these barter transactions, met with Mr. Thomas E. Eawlings, Director, Barter & Stockpiling Division, CSS, to discuss the possibility of extending the exportation date of the cotton beyond July 31, 1959. However-, Eawlings advised that the “additionality” phase of the *57 Department’s then current cotton export program was based upon the movement of the cotton by July 31, 1959, and that he consequently felt that the date could not be changed.
21. (a) Mr. William M. Hynds, of Washington, D.C., was a cotton consultant through whom plaintiffs’ commitments from the cotton merchants had been negotiated. Pie was familiar with the USDA February 4,1959, press release (finding 15) fixing the export subsidy on middling 1-inch cotton at average location at 8 cents per pound commencing August 1, 1959, and with the testimony of the Secretary of Agriculture and the other Departmental officials which was released on March 4, 1959 (finding 17). Since it would not be possible in February 1959 to forecast what the world market conditions in cotton would be for the marketing year commencing August 1, 1959, he concluded that the February 4, 1959, press release necessarily reflected the then current conditions, i.e., that an export subsidy of 8 cents per pound was then necessary to make middling 1-inch United States cotton at average location competitive in world markets. Pie also read the aforementioned testimony as amounting to a concession that CCC-owned cotton was currently priced too high to compete successfully in world markets, that section 203 of the Agricultural Act of 1956 required such competitive pricing, and that, in order to attain such pricing, it would be appropriate for the Secretary to review periodically, possibly monthly, the price set at the beginning of the marketing year. Although, as stated, the Secretary had not previously ever changed, during the marketing year, the previously fixed base export price of CCC-owned cotton (which, in effect, contained a subsidy), Hynds felt that, on the basis of the aforementioned testimony, there would be a strong possibility that the Secretary would review the set price and, for the balance of the 1958-59 marketing year, reduce it to the then current world competitive level. He was convinced that it was the Secretary’s obligation to do so under the statute, as he felt the Secretary conceded in his testimony, and he could see no reason for distinguishing between periodic revisions in the 1959-60 marketing year, to which the Secretary’s testimony concerning such revisions referred, and in the then current 1958-59 marketing year. On the basis of *58 the then current base export price of CCC-owned middling 1-inch cotton at average location of 28.30 cents per pound, with which price he was familiar, he calculated that, to be currently competitive in world markets, such CCC-owned cotton would have to sell for 23.25 cents per pound. This calculation was reasonably accurate.
(b) On March 19, 1959, Hynds sent the following letter to Parser:
This is in reply to your advice of March 17,1959 that you have received a telegram from CCC accepting your proposal to exchange industrial diamonds for CCC-owned cotton having an equivalent exchange value of $1,010,000 and that this telegram specified that the cotton must be exported to Belgium and the Union of South Africa on or before July 31,1959. This requirement to export the cotton by July 31, 1959 is entirely unsatisfactory with the cotton exporters who agreed to handle the cotton as your commodity agents.
You will recall that at my suggestion and in order to meet the request of the cotton exporters who were to act as your commodity agents, you included in the barter proposal which you submitted to CCC a provision that the cotton received in exchange for industrial diamonds to be supplied by you would be exported to Belgium and the Union of South Africa no later than December 31, 1959, a date twelve months after the date your proposal was submitted to CCC. The letters of commitment which I gave to you on behalf of these firms also contained a provision that the cotton would be exported within twelve months of the date of CCC’s acceptance telegram.
On account of the delay of two and one-half months on the part of CCC in acting upon your barter proposal, it would now be difficult, if not impossible, to meet your imposed barter condition that the cotton be exported no later than July 31, 1959. When I consulted with your commodity agents all of them pointed to the delay of more than two and one-half months since your barter proposal was submitted as being one of the many reasons it would be unsatisfactory to export the cotton by July 31,1959.
Again I should like to refer to the language of CCC’s acceptance telegram specifically as it commits CCC to deliver “CCC-owned cotton haying an equivalent total exchange value” in export' markets equal to the total exchange value of the industrial diamonds which you *59 will deliver. The equivalent value of cotton in the export market is the value prescribed in Section 203 of the Agricultural Act of 1956, as amended. This Act states in part, as follows:
“Sec. 203. In furtherance of the current policy of the Commodity Credit Corporation of offering surplus, agricultural commodities for sale for export at competitive world prices, the Commodity Credit Corporation is directed to use its existing powers and authorities immediately upon the enactment of this Act to encourage the export of cotton by offering to make cotton available at prices not in excess of the level of prices at which cottons of comparable qualities are being offered in substantial quantity by other exporting countries. . . .”
Inasmuch as the Secretary of Agriculture has already made and published a determination under Section 203 of this Act that the rate of export subsidy of 80 per pound is required to make U.S. cotton equivalent to the price of foreign growths, which amounts to an export price of 23^40 per pound for middling 1" cotton at average location on August.1, 1959, we require that this price criterion be followed as a basis for determining the exchange value of the CCC-owned cotton which the acceptance telegram commits CCC to deliver to you in “equivalent total exchange value” equal to the value of diamonds you will deliver to CCC.
I am authorized by the cotton firms which have issued commitments to you to act as your commodity agents to state that the identical cotton acquired from CCC or substitute cotton will be exported under the barter transaction either:
1. Prior to July 31, 1959, if the exchange value of the cotton is established in accordance with Section 203 of the Agricultural Act of 1956, as amended, which shall be based on 23340 per pound for middling 1" cotton at average location, or
2. Prior to March 16, 1960, with the cotton to be drawn down under the terms of the special program for release of cotton under barter as announced by the Department on February 4, 1959.
I would appreciate it if you would advise me at your earliest convenience which of the above two alternatives is acceptable to you and the Department of Agriculture.
(c) On March 20, 1959, Hynds sent a similar letter to Rough Diamond with respect to CCC’s acceptance of Rough Diamond’s proposal.
*60 (d) Plaintiffs similarly became convinced that, on the basis of the Secretary’s testimony, the February 4, 1959, press release and the January 1959 Foreign Agricultural Service publication, there was a strong possibility that the export price of the CCC-owned cotton which would have to be procured to complete their barter transactions, would be reduced to world market competitive levels. By letter of March 20, 1959, reading as follows, Rough Diamond forwarded to Rawlings of CSS the letter it had received from Hynds:
Enclosed please find letter of March 20, 1959, from Mr. William M. Hynds on behalf of our commodity agents. I would like to call your attention particularly to the two alternative bases upon which the commodity agents advise that they are prepared to accept delivery of the cotton which we will receive in exchange for industrial diamonds.
We wish to advise that we have no objection to either of these proposals, and request that you consider one or the other and authorize us to proceed with the one that is acceptable to you.
I [van Berg] shall be in Washington Monday, March 23rd thru March 25th, and would appreciate the opportunity of discussing this with you at your convenience.
(e) Similarly Parser, also by letter of March 20, 1959, reading as follows, forwarded to Rawlings the letter it had likewise received from Hynds:
We wish to thank you for the telegram, which we received on March 17th, accepting part of our barter proposal.
However, in accepting this proposal, we are confronted with the problem of disposing of the cotton within the time limit prescribed by the Government, i.e. July 31st, 1959.
We have put the Government’s proposal to Mr. William M. Hynds who is acting agent for the cotton exporters and we have received from Mr. Hynds the enclosed reply from which you will see that there are considerable difficulties in complying with the Government’s requirements.
Mr. Hynds has put to us two considerations encompassed in the last paragraph of his letter and we are *61 asking the Department of Agriculture to modify the contract proposal to meet one of the set conditions.
We would appreciate receiving your earliest possible reply on this matter as, of course, the ten days will expire very soon.
(f) However, on the same day, March 20, 1959, Parser, sent the following confirmation letter to the CSS Barter and Stockpiling Division:
We refer to your telegram of March 16th in which you accepted our barter proposal of December 26th, 1958 to exchange Industrial Diamonds for CCC-owned cotton valued at $1,010,000. of which cotton valued at $875,000. would be exported to Belgium and cotton valued at $185,000. would be exported to Union of South Africa.
Although our proposal stipulated that this cotton would be exported no later than December 81st, 1959, your acceptance telegram provided that the cotton shall be exported on or before July 31st, 1959.
We respectfully request that this barter transaction be divided into two contracts: — one for $875,000. covering cotton to Belgium and one for $135,000. covering cotton to Union of South Africa.
At this time, we confirm your acceptance telegram as it relates to $135,000. in cotton to be exported to the Union of South Africa and we will export such cotton on or before July 31st, 1959.
Please advise us and Mr. William M. Hynds the contract number assigned to the Union of South Africa portion of the transaction.
We will advise you later about the $875,000. in cotton to be exported to Belgium.
On March 23, 1959, CCC assigned No. BSD-SM-59-66 to such proposed contract, being Parser’s first of five contracts herein involved.
■22. On March 24, 1959, Hynds and Hathorn conferred with Robert O. Link, Chief of the Program Analysis Branch in the Barter and Stockpiling Division, CSS. Among other things, they discussed the proposals contained in the Hynds letters. Link advised Hynds and Hathorn that, in his opinion, the Department would be unable to accept these proposals, but further advised that these were policy matters over which Link had no control and that any final decision in the matter would have to be made at a higher level.
*62 23. (a) March 25, 1959, was, according to Parser’s calculation, the last day of the 10-day period within which it was requested to confirm CCC’s acceptance telegram of March 16, 1959. As shown (finding 21 (f)), Parser had, on March 20, 1959, confirmed $135,000 of CCC’s acceptance, i.e., the Union of South Africa transaction, leaving an $875,000 balance on the Belgium transaction open for confirmation. By letter of that date, i.e., March 25, 1959, Parser, “on account of extenuating circumstances,” requested “an extension of time until April 8, 1959, for us to send in our confirmation telegram.” The letter further stated: “It will be greatly appreciated if you will notify us as early as possible today that the extension requested has 'been granted.”
(b) That same day, i.e., March 25, 1959, COO notified Parser by telegram that the extension to April 8, 1959 was granted.
(c) However, by another letter dated the same day, i.e., March 25, 1959, Parser, after stating that “your acceptance telegram requested confirmation within ten days,” notified CCC that “At this time we confirm your acceptance telegram as it relates to $875,000 in cotton to be exported to Belgium.” The record does not indicate whether this letter was sent prior to the receipt of defendant’s extension telegram, referred to in paragraph (b) above. Although the formal contract covering this transaction had yet to be executed, No. BSD-SM-59-84 was assigned to such proposed contract, being Parser’s second contract herein involved.
(d) Meanwhile, during that same day, March 25, 1959, Hathorn and Van Berg conferred with Bawlings relative to the Hynds proposals. Bawlings advised that he could not agree to either one of the alternative proposals. He further advised that, if either proposal was accepted, plaintiffs’ offers would be treated as new ones and that, so considered, would have to be placed at the bottom of the list since offers were evaluated in the order in which they were submitted. Since CCC had received a large number of offers, it could be that plaintiffs’ losing their position would result in their offers failing to receive consideration. Bawlings further advised that his office had no control over the price at which cotton was being made available for export and that this was *63 a matter that had to be decided at a higher level, but that, in his opinion, the cotton had to be acquired at competitive bids in accordance with published announcements. However, Rawlings advised that a formal reply to Hynds’ proposals would be sent in due course after the proposals had received the consideration of the appropriate officials.
24. On March 26, 1959, Hathorn again conferred with Link, who advised that, in his opinion, it would not be possible for the Department to allow exportation of cotton beyond the July 31, 1959, deadline specified in CCC’s acceptance telegrams. Link, who was intimately connected with the establishment of exportation dates because he was a member of the Additionality Committee which dealt with these matters, stated, as had Rawlings previously (finding 20), that the barter program then current had been premised, from an “additionality” point of view, on exportation of cotton by July 31, 1959.
25. (a) On April 3, 1959, Hathorn and a Mr. Muir, a representative of a grain firm, met with Rawlings to discuss the possibility, on plaintiffs’ proposed barter contracts, of switching from cotton to another commodity. However, this possibility was not pursued because Rawlings advised that this action too would cause plaintiffs’ offers to be treated as new ones resulting in their losing their positions. As previously noted, plaintiffs were interested in having the barter transactions upon which they made offers consummated because, being diamond merchants, this type of transaction enabled them to dispose of their large stock of surplus industrial diamonds for which there might not otherwise have been a market. One of the conditions to the barter transaction was that the diamonds involved were in fact surplus to normal industrial needs.
(b) By telegram dispatched that same day, i.e., April 3, 1959, to Parser, CCC accepted Parser’s offer of December 27, 1958 (finding 3 (b)), offering $300,000 in industrial diamonds. The telegram was similar to CCC’s acceptance telegram to Parser dated March 16, 1959 (finding 18 (a)), except that no foreign country was mentioned from which the diamonds had to come or to which the agricultural commodity had to be exported, no specific agricultural commodity was *64 mentioned, nor was any time limit specified for tbe exportation. Confirmation witbin 10 days was again requested.
26. Tbe 10-day period within which Rough Diamond was requested to confirm CCC’s acceptance telegram of March 17, 1959 expired on March 27, 1959. However, in accordance with Rough Diamond’s request, the time witbin which it was permitted to confirm was extended to April 8, 1959, the same extension date that had been granted to Parser (finding 23(b)). On April 6, 1959, Rough Diamond sent the following confirmation telegram to CCC:
Reurtel 3-16-59 accepting our offer 12-31-58, we confirm our acceptance stop. Based upon original addition-ality data submitted our offer, we respectfully request participation in current barter program for cotton, or at our risk, any new program instituted for cotton prior August first, or thereafter up to December 31,1959 which is date contemplated our original offer. Please give telegraphic affirmation.
Even prior thereto, Rough Diamond had decided to proceed with the barter transaction. On March 30, 1959, it had, through Hynds, arranged with Patton Brothers Co. of Dallas, Texas, to act as its commodity agent in the purchase of CCC cotton in the amount of $62,000 to apply against this barter transaction. It had also made similar arrangements with the Allenberg Cotton Company, Inc. of Memphis, Tennessee, on March 31, 1959, in the amount of $350,000; with Geo. II. McFadden & Bro., Inc. of New York City, also on March 31, 1959, in the amount of $199,000; with Hohen-berg Bros. Co. of Memphis, Tennessee, on April 2, 1959, in the amount of $50,000; with Starke Taylor and Son of Dallas, Texas, on April 3, 1959, in the amount of $75,000; and with Volkart Brothers, Inc. of New Orleans, Louisiana, on April 6, 1959, in the amount of $75,000.
A very large amount of cotton had to be moved under this barter transaction prior to July 31,1959, and it was necessary that prompt action to this end be taken. CCC’s acceptance telegrams fixing a July 31, 1959, export deadline had caused those of plaintiffs’ previous commitments from the cotton merchants which had been based on a December 31,1959 deadline to become ineffective. Plaintiffs were therefore faced *65 with the necessity of making new arrangements on the revised basis and at substantial discounts reflecting the then current disparity between foreign and C'CC floor prices. However, plaintiffs felt that, if the Secretary did in fact thereafter during the then current marketing year lower the CCC export price to competitive levels, the discounts with their cotton merchants could be renegotiated. As stated, they felt that, considering the general United States cotton export policy emphasized in the January 1959 Foreign Agricultural Service publication (finding 10), there was a strong possibility that the Secretary would, through the periodic revisions he discussed at the hearings released on March 4, 1959 (finding 17), lower the CCC floor price to competitive levels during the current 1958-59 marketing year.
27. (a) On April 7, 1959, CCC sent to Rough Diamond the following telegram:
Request contained urtel 4-6-59 cannot be granted. Contract Number BSD-SM-59-85 assigned this transaction under which cotton shall be exported to United Kingdom in accordance all provisions ourtel 3-16-59.
(b) By letter dated the same day, April 7,1959, which was received by Rough Diamond on April 9, 1959, CSS advised Rough Diamond as follows:
With reference to your telegram of April 6, 1959, confirming CCC’s acceptance dated March 16, 1959 of your offer to exchange Industrial Diamonds for agricultural commodities owned by CCC, you are advised that Contract No. BSD-SM-59-85 has been assigned to this transaction, and when a commodity exchange contract is signed it will carry this number.
Agricultural commodities deliverable under the terms of the offer and acceptance which are acquired from CSS Commodity Offices may be made applicable to barter under this assigned contract number. For the purpose of such application you must designate this contract number at the time of purchase.
An agent or agents may be appointed to handle agricultural commodities on behalf of the contractor, and the Barter and Stockpiling Division must be notified of each designation.
This is Rough Diamond’s only contract herein involved.
*66 28. (a) On April 9, 1959, Parser telegraphed its confirmation of CCC’s acceptance telegram of April 3,1959, concerning Parser’s $300,000 offer of December 27, 1958. The telegram stated in part: “We herewith accept this contract subject to clauses enumerated in your telegram. We request the issuance of a contract number after which we will advise hi which commodity we will effectuate barter.” Parser thereafter designated cotton as the commodity it desired to export and the transaction was assigned proposed contract No. BSD-SM-59-93. This was Parser’s third contract herein involved. The cotton was to be exported to Hong Kong. As noted, there was no requirement in CCC’s telegram of April 3, 1959, relative to this transaction that the commodity be exported by July 31, 1959. However, the cotton under this contract was actually exported prior to such date.
(b) On the same day, i.e., April 9,1959, plaintiffs received identical letters dated April 8, 1959, from the Executive Vice President of Commodity Credit Corporation rejecting the proposals made by Hynds to plaintiffs and forwarded by them to defendant on March 20, 1959 (finding 21(d) (e)). CCC’s reply reads as follows:
We have carefully considered the proposals regarding Ericing and exportation of cotton under your accepted arter offer which are contained in the letter from Mr. William M. Hynds, dated March 20, which you forwarded with your letter of March 20, addressed to Mr. Thomas R. Rawlings, Director, Barter and Stockpiling Division, Commodity Stabilization Service. Our acceptance telegram stipulates that the cotton acquired under this barter transaction be exported on or before July 31, 1959.
The first proposal made by Mr. Hynds was that the cotton be exported by July 31, but that the exchange value of such cotton be established in accordance with an announcement by the Secretary of Agriculture specifying the export payment rate on cotton shipped in the new crop year beginning August 1, 1959. Since this export payment rate has no application to cotton shipped before August 1, we perceive no grounds upon which we could agree to Mr. Hynds’ first proposal.
As an alternative, Mr. Hynds has proposed that the cotton under your barter acceptance be exported by *67 March 16, 1960 under the terms of Press Release USD A 344-59 dated February 4, 1959. This release pertains primarily to the payment-in-kind export program for cotton during the 1959-60 marketing year and relates to the barter program only in stating that cotton will continue to be drawn from CCC stocks for barter, credit sales, donations, and emergency operations. The export payment rate announced in this press release is the rate applicable for cotton shipped on or after August 1, 1959. Barter proposals to export cotton before August 1 have been accepted primarily because of the present world price situation affecting cotton. It is not possible for us to foresee at this time what this situation will be during the new crop year beginning August 1, 1959 or to determine on a general basis that cotton bartered after that date would not unduly disrupt world prices or displace cash sales of cotton for dollars. We are therefore unable to accept Mr. Hynds’ alternative proposal. Barter offers proposing to export cotton subsequent to July 31, 1959 will continue to be evaluated on a case by case basis as received, with a separate determination being made on the basis of the merits of each offer submitted.
We shall appreciate your prompt confirmation of the terms contained in our acceptance telegram of March 16, 1959 or advice that you have decided not to proceed with this barter.
Insofar as the last paragraph of the letter requested confirmation of the terms contained in CCC’s acceptance telegrams of March 16, 1959, plaintiffs considered such paragraph inapplicable to confirmations already submitted prior to the receipt of the letter. As shown, Bough Diamond had, on April 6, 1959, already confirmed its $4,740,000 transaction (finding 26) and Parser had, on March 20, 1959, and March 25, 1959, confirmed transactions in the amounts of $135,000 (finding 21(f)) and $875,000 (finding 23(c)), respectively. Ths record does not show whether the $300,000 confirmation by Parser referred to in paragraph (a) herein was made prior or subsequent to the receipt by it on April 9, 1959, of defendant’s letter. Plaintiffs could have withdrawn from the barter transactions, after receiving this letter of April 8, 1959, despite any prior confirmation they had submitted, without incurring any statutory or contractual penalties.
*68 29. By telegram of May 12, 1959, CCC accepted Parser’s January 26, 1959, $700,000 offer of diamonds from the Netherlands and Belgium (finding 9). The telegram stated in part: “Industrial diamonds to be exchanged for CCC-owned cotton having exchange value of $300,000 which shall be exported to the Netherlands and having exchange value of $100,000 which shall be exported to Belgium. All cotton shall be exported on or before 7-31-59 in accordance Press Release 3182-58 dated 11-14^58.” In all other respects, the telegram was similar to the previous CCC acceptance telegrams.
30. On May 15, 1959, Parser requested that its $875,000 proposed contract 59-81 (finding 23(c)) be increased by $10,000 to $915,000.
31. (a) By letter of May 21, 1959, Parser confirmed that part of CCC’s acceptance telegram of May 12, 1959, relating to the “exportation of cotton to Belgium having an exchange value of $100,000.” This portion was subsequently given a separate contract number of BSD-SM-59-122. This was Parser’s fourth contract herein involved.
(b) By a separate letter of May 21,1959, Parser requested an extension of time of 10 days within which to confirm that part of CCC’s acceptance telegram of May 12,1959, relating to the export of cotton to the Netherlands in the amount of $300,000. Parser made this request:
In view of the fact that the Netherlands imports very high grade cotton and the present catalogue of CCC-owned cotton of approximately 237,000 bales is of qualities unsuitable for the Netherlands, and whereas the CCC recently withdrew from its catalogue about 861,000 bales for reclassification and restoration to the catalogue, and such catalogue will no doubt contain qualities suitable for export to the Netherlands * * *.
(c) By telegram of May 22, 1959, CCC granted Parser’s confirmation extension request and gave it “until close of business 6-1-59 regarding $300,000.00 bilateral exchange of industrial diamonds' for cotton to be exported to Netherlands.”
32. By invoice dated May 26,1959, Rough Diamond submitted industrial diamonds which were inspected and ac *69 cepted on behalf of CCC by Government appraisers on May 27, 1959, for a total value of $4,751,958.94. Although there was considerable bargaining between Rough Diamond’s and defendant’s agents concerning the value of the diamonds, defendant’s agents made the final appraisal, determination, and offer figure to Rough Diamond. There is no indication, however, that Rough Diamond was dissatisfied with such final valuation determination by defendant, and plaintiffs in this proceeding are not contesting the value placed on the diamonds.
33. By telegram of May 28, 1959, Parser’s request to increase its $875,000 proposed Contract No. 59-84 by $40,000 was, “subject to all conditions stated” in CCC’s original acceptance telegram of March 16, 1959, granted.
34. By letter of May 29, 1959, the Comptroller General submitted to the Speaker of the House of Representatives the Comptroller General’s report of his audit of the CCC. That letter stated in part as follows:
Herewith is our report on the audit of Commodity Credit Corporation, Department of Agriculture, for the fiscal year 1958. Although this report pertains primarily to the financial statements, accounting, and internal control, it includes several significant findings and recommendations relating to other matters.
The places at which CCC has made cotton available for export for the 1958-59 marketing year have been maintained at levels in excess of competitive world prices. This action, in our opinion, does not comply with the requirements of section 203 of the Agricultural Act of 1956. We are recommending that the Secretary of Agriculture periodically adjust prices at which CCC makes cotton available for export. We are recommending also that the Secretary determine at least annually the volume of cotton exports necessary to maintain the fair historical share of the world market for United States cotton.
35. By telegram of June 1, 1959, which was the extended date for Parser to confirm OCC’s acceptance of Parser’s $300,000 offer relating to the export of cotton to the Netherlands, Parser confirmed such acceptance but only up to the lower amount of $116,830. The telegram explained that Parser could “only confirm” this amount on “account your *70 delay accepting our proposal * * Tbis transaction was assigned the separate proposed contract No. BSD-SM-59-135. This was Parser’s fifth and last barter transaction herein involved, the acceptances and confirmations totaling $1,866,830, as follows:

,36. On June 22, 1959, Parser submitted industrial diamonds which were inspected and, on July 1,1959, accepted on behalf of CCC by Government appraisers for a total value of $1,870,692.62, applicable as follows to the following contracts:

The same procedure for valuation of the diamonds was applicable as had been adopted with respect to Rough Diamond (finding 32). There is similarly no indication that Parser was dissatisfied with defendant’s final diamond valuation determinations.
37. (a) By telegram dated April 16, 1959, Rough Diamond had advised the Barter and Stockpiling Division as follows:
This is to advise you that William M. Hynds has been authorized by us to submit to you on our behalf the names of our commodity agents and the exchange value of cotton to be applied by each on Contract BSD-SM- *71 ’59-85 and he is further authorized to make any adjustment necessary in the amounts applied:
Thereafter, by 24 letters sent between April 16 and July 9, 1959, Hynds supplied CSS with the names of the commodity agents who were to obtain cotton from CCC under said barter contract, and “the exchange value of cotton to be applied” by each on the contract. ' .
(b) By telegram dated March 26,1959, Parser had advised CSS as follows concerning Parser’s first contract, which Parser had confirmed on March 20, 1959 (finding 21 (f)) :
We authorize Volkart Brothers, Inc. to draw down CCC cotton in the amount of $135,000 as our commodity agents under Contract BSD-SM-59-66, to be shipped to Union of South Africa.
'Similar telegrams were sent relative to Parser’s four other contracts, and CSS was thereafter notified by Hynds or the commodity agents of the number, of bales of cotton purchased which were to be applied to a particular barter contract and the value of said cotton.
(c) Bough Diamond acquired cotton for export, through the commodity agents, during the period beginning April 15, 1959, and ending July 1, 1959. Parser acquired cotton for export, through the commodity agents, during the period beginning March 18, 1959, and ending July 14, 1959.
Cotton was acquired by the cotton merchants in accordance with the procedures outlined in Sales Announcements NOC-ll and CN-EX-5, dated April 23, 1958 (finding 14). The cotton merchants paid cash for the cotton. After the cotton merchants filed a “proof of export” with the USDA and the applicable barter contract between plaintiffs and the ÍJSDA was executed, plaintiffs received refunds of these payments and in turn remitted (or had already remitted)' to the cotton merchants the discounts provided for in their commitment agreements (finding 12).
As noted, the cotton merchants acquiring cotton under these Barter contracts were not required to export-the identical cotton, but merely an equal'quantity of cotton: By “substituting” a different grade of cotton which they held in their inventories or acquired from other sources, the cotton mer *72 chants were then able to sell the CCC-owned cotton domestically and possibly make a profit on that phase of the transaction.
38. Rough Diamond’s commitments from the cotton merchants were effective up to March 31, 1959 (finding 16). Some transactions between Rough Diamond and the merchants were completed prior to March 31, 1959, indicating a decision by Rough Diamond to proceed with the barter prior to its confirmation telegram of April 6, 1959 (finding 26). On the balance, however, it was necessary to make new arrangements after March 31, 1959. Furthermore, insofar as previous commitments envisaged export subsequent to July 31, 1959, the commitments had to be renegotiated. A much larger number of cotton merchants actually participated in the transaction than was anticipated under the original commitments (finding 7). The details of all the actual commitments or arrangements between Rough Diamond and the commodity merchants are not in evidence. However, the following list would appear to be representative:

*73 A letter dated March 31, 1959 from Hynds to Geo. H. McFadden & Bro. is typical of the letters sent by Hynds to such cotton merchants with respect to these arrangements:
I wish to confirm the sale I made to your firm today on behalf of Rough Diamond Co., Inc., New York of $199,000 in barter funds. Your firm has agreed to take delivery of cotton from CCC valued at $199,000 and export such cotton to England no later than July 31, 1959.
The amount of discount allowed to your firm by Rough Diamond Co., Inc. is 12% on the exchange value of the cotton drawn down by you and exported to England. This discount is payable to you at the time you file proof of export of the cotton with the CSS Commodity Office in New Orleans.
A detailed operating agreement will be prepared and sent to you covering this transaction.
Similar arrangements and discounts were applicable to the Parser transactions.
As hereinabove stated, during the period March 18-July 14, 1959, when the cotton merchants acquired CCC-owned cotton under plaintiffs’ barter transactions, CCC-owned cotton was, in many instances, priced 5-7 cents higher than comparable foreign growths in world markets (finding 11).
The discounts finally arranged were greater than those originally arranged for in the December 1958 commitments (finding 12). This reflected the further decrease in cotton prices in Liverpool, England, after December 1958. One reason for such further decrease was the February 4, 1959, USDA press release (finding 15) announcing an increase in the United States export subsidy rate to commence August 1, 1959. This had the effect of causing foreign producers to 'begin dumping their cotton on the foreign markets, thus further depressing the already lower prices of foreign growths in foreign markets.
39. At the times pertinent herein, the cost of processing and shipping cotton from an average United States inland warehouse location to Liverpool, England, was 5y2 to 7 cents per pound.
*74 40. During the 1958-59 marketing year énding July 31, 1959, exports of United States cotton- declined from the 5,700,00.0- bales exported, during the previous marketing year to 2,800,000 bales. One important factor contributing to such decline was the lower prices generally being offered by many foreign cotton growing countries.[6] Other factors were (a) the large inventories previously accumulated in foreign -countries, thereby temporarily cutting foreign demand, and (b) the large rise in production in certain foreign countries resulting in increased foreign offerings at a time of decreased foreign demands.- Underdeveloped foreign cotton producing countries lack the-financial resources to carry cotton inventories over for an extended period of time and are therefore obliged to dispose of their growths on a current, basis. This increased seasonal supply coupled with decreased demands also caused a sharp decline in prices and a resulting price, war in foreign markets into which the United States refused *75 to enter in order to prevent accentuating a chaotic situation and further demoralizing world price levels.
41. One of plaintiffs’ contentions is that, if they had known that the Secretary of Agriculture would not, during the balance of the 1958-59 marketing year, lower the CCC export floor price on its cotton to make it competitive with prices of comparable grades being offered in substantial quantities in foreign markets, they would not have confirmed the acceptances by CCC of their barter offers. The record is, however, insufficient to sustain this contention. It does instead indicate that plaintiffs were so anxious to dispose of their large surplus diamond inventories, which they had expressly accumulated for barter transaction purposes, that they would have proceeded with the transactions in any event. They entered the foregoing barter transactions voluntarily, and were not coerced or misled into doing so. No effort was ever made by plaintiffs to rescind any of the transactions or to obtain a reformation on the grounds of mistake, mutual or otherwise, with respect to the cotton prices. The record indicates no reply by plaintiffs to CCC’s letters of April 8, 1959 (finding 28 (b)), rejecting the Hynds proposals. Plaintiffs were prepared to accept some loss on the cotton in any event. Even if CCC cotton for export were purchased at competitive prices in foreign markets, no profit could be made on the transaction because of the costs that would have to be incurred in moving the cotton into the foreign markets. Thus, plaintiffs never contemplated making any profit on the cotton part of the barter transactions. The cotton was simply a device for converting their diamonds into dollars. While plaintiffs may have been disappointed in the conversions having to be made at that particular time at such a large discount, they knew when they made their original offers in December 1958 that the competitive situation had already deteriorated to such an extent that their cotton merchants were making commitments only on the basis of relatively large discounts (finding 12) as compared with similar commitments they had received in September 1958. The discounts in December were approximately 10 percent. Thus, plaintiffs were prepared to proceed with barter deals on the basis of large discounts even prior to the January 1959 For *76 eign Agricultural Service publication (finding 10), the February 1959 announcement of the 1959-60 marketing year subsidy export (finding 15), or the Secretary’s Congressional testimony during that month which was released in March 1959 (finding 17). The discounts of approximately 12 percent which plaintiffs ultimately paid were not so much greater, considering their strong desire to dispose of their surplus diamond stocks, that they would have caused plaintiffs to drop the transactions unless they felt assured that the cotton floor price would be changed to competitive levels. Even after the original 10 percent discount commitments had expired, but still prior to CCC’s acceptances and plaintiffs’ confirmations, new commitments at discounts of 12 percent and higher were obtained (finding 16) and yet plaintiffs’ offers theretofore made were still permitted to stand.
42. On August 25, 1959, Rough Diamond advised CCC that it had “delivered industrial diamonds and exported cotton, under the terms of our mutual acceptances”, and requested the formal contract. On September 1,1959, CCC replied that “It is anticipated that diamond contracts will be submitted to all contractors in the very near future.” Thereafter, by letters of September 21, 1959, CCC submitted to plaintiffs for execution a proposed contract covering Rough Diamond’s transaction and one covering Parser’s transaction numbered 59-66, together with copies of a form entitled “Uniform Barter Contractual Provisions” which was referred to in each contract.
43. By letter of September 29, 1959, Parser returned to defendant contract 59-66 which it stated it executed “with the understanding that if any part of this detailed contract is in conflict with the general terms stated in your acceptance telegram of March 16, 1959 the terms of such acceptance telegram shall govern.” On September 30,1959, Rough Diamond returned its contract with a letter making identical statements.
44. By letter of October 2, 1959, defendant informed Parser that:
* * * We have never attempted to state in acceptance telegrams all provisions applicable to a barter contract and for this reason each such telegram states it is subject to the execution of a mutually acceptable contract.
*77 We cannot recommend execution of the subject contract on behalf of the Commodity Credit Corporation as long as your above-quoted understanding is in effect. Therefore, at such time as you may return the attached after execution by you, we shall take no further action regarding this contract unless further information is received from you in this regard.
Presumably a similar letter was sent to Rough Diamond.
45. (a) By letter of November 25, 1959, to defendant, Rough Diamond advised that it refused to execute the contract as submitted to it. The letter stated as follows:
We wish to acknowledge receipt of your letter of September 21, 1959, in which you enclosed five (5) copies of the proposed formal form of contract for the subject contract.
We have not, and cannot, accept and execute this proposed formal form inasmuch as it does not represent the existing agreement between the parties as set out in the Invitation for Bids of December 24,1958, our offer of December 31, 1958, the acceptance of that offer by Commodity Credit Corporation on March 16, 1959, and the required final confirmation by this Company on April 6, 1959. Your letter of April 7, 1959, assigned the referenced contract number to the agreement between the parties.
We hereby request that the proposed form of formal contract be changed to carry out the evident intent of the parties, expressed by the existing agreement and the requirements of Section 203 of the Agricultural Act of 1956, as amended, to provide that the cotton delivered by the government in fulfillment of its contract obligation be valued at the competitive world market price, which the Department of Agriculture has heretofore indicated as being not in excess of 23.24 cents per pound for middling one-inch cotton at average location in the United States. The formal form of contract must reflect CCC’s contractual commitment to deliver cotton to this Company equivalent in value to the value of the diamonds which we committed ourselves to deliver.
As you know, the Rough Diamond Company has gerformed itspart of the contract in full. However, the ommodity Credit Corporation has not performed in full in that it agreed to deliver CCC-owned cotton having equivalent value to the $4,751,958.94 of industrial diamonds which we were required to deliver and have delivered. To fulfill its agreement the Commodity *78 Credit Corporation still must deliver to this Company cotton valued at approximately $1,000,000, for which we hereby make demand.
The basis for this claim.and demand is as follows:
1. Section 203 of the Agricultural Act of 1956, as-amended, directs the CCC to make cotton available for export at competitive world prices.
2. The CCC arbitrarily established on May 12, 1958 a minimum acceptable export sales price of 28.30 cents per pound for middling one-inch cotton for export during the marketing-year ending July 31,1959. Other exporting countries were offering cotton of comparable quality in substantial quantities O.I.F. Liverpool, during April, May, June and July 1959, at prices approximately 6%-cents below the C.I.F. Liverpool price of U.S. cotton, as a result of this arbitrarily established minimum acceptable price. Therefore, CCC’s arbitrary floor price was approximately &y2 cents per pound above the world market price.
3. On February 4,1959, the Secretary of Agriculture acknowledged that the previously established minimum acceptable export sales price' of 28.30 cents per pound was in excess of the current world market price by announcing a new export program which reflected a reduction in export price of approximately 5 cents per pound to 23.24 cents per pound for middling one-inch cotton at average location.
4. Notwithstanding the above, Commodity Credit Corporation valued the cotton delivered under our contract on the basis of a rate of not less than 28.30 cents per pound for middling one-inch cotton at average location.
Since the law directs the CCC to make cotton available for export at the competitive world market price, and this company was required by the existing agreement to acquire cotton from CCC for export, a maximum price of 23.24 cents per pound for middling one-inch cotton should have been, and must be, the basis for valuation of the cotton delivered by the Commodity Credit Corporation to the Kough Diamond Co., Inc., under the contract.
We hereby request that the formal form of contract be redrafted to truly reflect the agreement of the parties and to protect our rights as outlined above. We further request an opportunity to confer with you in regard to this matter.
(b) On December 7, 1959, Parser sent to defendant an identical letter except for the contract number (59-66); the *79 offer date (December 26, 1958); the difference between the United States and the Liverpool C.I.F. price (stated here to be 6% cents instead of 6% cents); and the amount of the claim ($29,926.60 on the one contract in question).
46. Pursuant to the request contained in plaintiffs’ letters of November 25 and December 7, 1959, a conference was, on December 7, 1959, held between the officials of the Barter and Stockpiling Division and Hathom, representing both plaintiffs in the matter of their claims and the execution of the contracts.
47. (a) By letter dated December 24, 1959, Clarence D. Palmby, Acting Executive Vice President of OCC, advised Rough Diamond as follows:
This will acknowledge your letter of November 25, 1959 stating you have not,, and cannot, accept and execute the subject contract transmitted by letter dated September 21, 1959. You request that such contract reflect a different basis for establishing the exchange value of cotton and make demand on thé Commodity Credit Corporation for additional cotton valued at' approximately $1 million. Pursuant to the request contained in the last paragraph of your letter, Mr. Herbert C. Hathorn discussed your position in this regard on December 7, 1959 in the Barter and Stockpiling Division.
The basis stated for your claim and'demand has been thoroughly reviewed and fully considered and as a result, your claim must be, and is hereby, denied.
It is requested that you execute the contract transmitted to you on September 21, 1959 and that you return it to the Barter and Stockpiling Division no later than January 2, 1960. In the event this is not done, COC will be obliged to take such further action as may be appropriate.
(b) A similar letter was sent to Parser under the same date.
(c) Subsequently, plaintiffs’ time for the execution of their contracts was extended to February 17, 1960.
48. (a) In reply to defendant’s letter of December 24, 1959, Rough Diamond, by. letter dated January 22, 1960, advised in part as follows:
* * * * *
We are willing to negotiate a mutually satisfactory formal form of contract reflecting the existing agree *80 ment, but in the event that you are not willing to negotiate such a contract, and your letter of December 24, 1959 is considered to be a final decision of the Contracting Officer, we wish to appeal the decision to the appropriate head of the Agency. We are making this appeal only for the purpose of preserving our contract administrative rights.
In the meantime we are preparing additional material supporting our position as set out in our letter of November 25,1959, which we will have ready for you in the near future. If you are willing to reconsider this matr ter, we feel confident we can convince you of the correctness of our position. We will contact you in the near future to request a conference at which time we can present the above mentioned supporting material.
* * * * *
(b) On the same date, Parser sent an identical letter pertaining to all five of its contracts.
49. (a) By an “appeal” letter of February 11, 1960, to the Under Secretary of Agriculture, Rough Diamond (by its attorney), submitted “a documented statement supporting” its position “regarding the disagreement over ‘equivalent value’ of cotton to be delivered by CCC” under the barter contract, and requested that the matter be reviewed, that a written decision be issued, and that no action be taken on February 17, 1960, “until the conclusion of this appeal.”
(b) On February 16, 1960, Parser sent a similar “appeal” letter to the Under Secretary, and also stated therein:
The A. G. Parser, Inc. case, and/or each segment thereof, is parallel in scope to the case of Rough Diamond Co., Inc., 630 Fifth Avenue, New York, New York. The material supporting the position of A. G. Parser, Inc. is identical to the material submitted in support of the Rough Diamond Co., Inc. case, and in previous discussions, officials of the Department have heretofore recognized this similarity of claims by making identical findings. Therefore, we respectfully request that you consider the documentation and supporting material submitted to you in the Rough Diamond Co., Inc. case as also being in support of the correctness of the A. G. Parser, Inc. position in this similar matter. If this is acceptable to you, we herewith request that this matter be reviewed along with the Rough Diamond Co., Inc. case and a written decision be issued by the appropriate *81 authority indicating that the A. G. Parser, Inc. has exhausted its administrative remedies.
50. (a) By letter to Rough Diamond’s attorney dated February 17, 1960, the Acting Secretary of Agriculture advised that:
Under the established policies of Commodity Credit Corporation, full authority to settle and adjust claims by and against the Corporation is vested in the Executive Vice President. In this case, Mr. Clarence D. Palmby as Acting Executive Vice President was authorized to take the action outlined in his letter to your client of December 24, 1959. You may, therefore, take his declination of your client’s claim as final for the purpose of any legal action you may wish to pursue.
He further stated, however, that Mr. Palmby had given assurances “that until the brief [submitted by Rough Diamond’s attorney together with his letter of February 11,1960] has been fully considered and you have been notified, Commodity Credit Corporation will not take any action in this matter.”
(b) On the same date, a similar letter was sent to Parser.
51. (a) On May 25, 1960, Mr. Palmby conferred with plaintiffs’ attorney and with Hathom about plaintiffs’ claims. At such meeting, a letter executed by Mr. Palmby and stating in part as follows was handed to plaintiffs’ representatives:
* * * * *
As you know, the Executive Vice President of the Commodity Credit Corporation declined your client’s claim for additional cotton under this transaction on December 24, 1959. As was pointed out on February 17, 1960, this declination of the claim may be taken as final for the purpose of any legal action your client might wish to pursue.
The Executive Vice President of the Commodity Credit Corporation has, however, further reviewed the matter for the purpose of reaching a decision as to the nature of the action which it will take to protect its interests.
Rough Diamond Company, Inc. is again requested to execute the five (5) copies of the proposed contract which were transmitted to it by letter from the Barter and Stockpiling Division, CSS, on September 21, 1959. *82 If such contract is executed, settlement of this barter transaction will be concluded according to the terms of the contract.
If such executed copies are not received by the Barter and Stockpiling Division, CSS, on or before May 26, 1960, the acquisition of cotton by Rough Diamond Company, Inc. shall be deemed to have the status of a cash sale under the applicable sales announcements and in accordance with the provisions of the document known as “Transactions Prior To 'Signing Barter Contracts”, dated May 2, 1958. Also, in order to partially satisfy your client’s obligation to pay cash for the cotton, if the contract is not signed, the Commodity Credit Corporation will draw against the outstanding letter of credit for the full amount thereof.[7] Further, under the provisions of “Transactions Prior To Signing Barter Contracts,” the Commodity Credit Corporation will reject all of the industrial diamonds delivered by your client pursuant to the subject contract and will expect your client to promptly pay the Commodity Credit Corporation in- cash any- unpaid balance of the sales price of the cotton, determined in accordance with applicable sales announcements, including interest, and for all costs incurred by the Commodity Credit Corporation in connection with the evaluation, storage and handling of the industrial diamonds. Until such time as your client effects payment of any remaining balance, the Commod‘ity Credit Corporation will continue to hold the rejected industrial diamonds as security for the amount due. If the remaining balance is not paid in cash by June 27, 1960; the Commodity Credit Corporation will dispose of the industrial diamonds and will apply the proceeds realized to the balance due from the Rough Diamond Company, Inc.
The Commodity Credit Corporation will remit to your client the excess funds, if any, realized from the disposition of the industrial diamonds or will collect from your client any balance remaining unpaid.
(b) At the meeting, a similar letter was handed to plaintiffs’ representatives concerning Parser’s claim.
52. (a) The following day, May 26, 1960, plaintiffs’ attorney and Hathorn conferred again with Palmby and at such conference handed to Palmby Rough Diamond’s pro *83 posed contract duly executed by Rough Diamond. Such contract was accompanied by the following letter, dated May 26, 1960, executed by the attorney and' addressed to Palmby:
In reply' to your letter of May 25th, which requests Rough Diamond, Inc. to execute the proposed contract covering exchange of CCC-owned cotton for industrial diamonds, which was transmitted to' our company on September 21, 1959, please be advised that an executed copy of said proposed contract is submitted herewith. We have no. reasonable or practical alternative .to your demand, since you state that “if the contract is not signed, the CCC will draw against the outstanding letter of credit for the full amount thereof.” We have repeatedly advised you that in our opinion the proffered contract varies substantially from the general terms of our agreement as embodied in the correspondence finalized- by your acceptance telegram of March 16, 1959. We have asked the Comptroller General to pass upon our claim (File No. B-142771 GAO), but have received no ruling as of this date.
Your letter of May 25th states that you will draw upon our letter of credit with the Chase Manhattan Bank No. 858218 in the sum of $475,195.89. We have already extended this letter of credit to June 1, 1960, at your request, at an additional cost to us of $8,638.55. We believe that you are compelling us to sign the proposed contract under threat of a possible penalty or forfeiture under the letter of credit, despite the fact that there is a bona fide dispute between us as to the terms of the agreement covering the transaction, which has already been consummated on both sides. Therefore, we .are complying with your request under protest,- and advise you that we do not waive our right to claim that we have not received cotton of equivalent value to our diamonds..
(b) Palmby, upon reading the letter, concluded that CCC could not accept the proposed contract under the conditions set forth therein. After so advising plaintiffs’ attorney, he thereupon returned both the letter and the contract to him. However, plaintiffs’ attorney then requested that the contract be accepted for execution by CCC without the letter. Upon Palmby’s agreement, the contract was thereupon handed back to Palmby by plaintiffs’ attorney.
*84 63. On May 27, 1960, the Deputy Director of the Barter and Stockpiling Division, CSS, wrote to plaintiffs’ attorney as follows with respect to the events of the previous day concerning Rough Diamond’s proposed contract:
This will confirm that on May 26, 1960, at or about 4:10 p.m., you and Mr. Herbert C. Hathom presented to this Division four copies of the subject contract which were executed on September 30, 1959, on behalf, of the subject firm.
This contract was transmitted by your letter dated May 26,1960, which stated, among other things, that you were complying under protest with the request of the Commodity Credit Corporation, as contained in Mr. Palmby’s letter to you of May 25, 1960. It was determined promptly by the Commodity Credit Corporation that statements in your letter created conditions which were not acceptable to the Commodity Credit Corporation. Upon being informed of this fact, and at which time your letter and all copies of the subject contract were returned to you, you retained the letter and asked that the copies of the contract be accepted without the letter.
Execution of the contract will be recommended promptly to the Executive Vice President, Commodity Credit Corporation. Thereafter, settlement of this transaction will proceed in accordance with the fully executed contract.
54. Thereafter, the formal contracts were executed by the parties. Each of the contracts provided that all of the articles of a “Form CCC-111 (7-13-59)” entitled “Uniform Barter Contractual Provisions” were incorporated in the contract by reference. Article V of said Form provided:
Liquidated Damages
(a) Except as provided in paragraph (b) of this article, upon termination by CCC * * * of the contractor’s right to make deliveries of material under the contract, the contractor shall pay to CCC as liquidated damages and not as a penalty an amount computed at the rate stated in the contract based on the undelivered quantity of material which the contract requires to be delivered.
(b) Liquidated damages shall not be payable as to any part of the material which the contractor is prevented from delivering due solely to causes without the *85 fault of the contractor. Such causes may include but are not restricted to: Acts of God, of the public enemy or of government; fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather; and, in the event the contractor notifies CCC in writing promptly after learning of imminent default by a subcontractor, defaults of such subcontractor due to any of such causes unless, acting upon each notice, CCC (1) determines that the material to be furnished by the subcontractor is obtainable from other sources at a comparable cost and in sufficient time to permit the contractor to meet (except with regard to source) the contract requirements, and (2) authorizes delivery of material from such other sources. The contractor’s obligation to accept delivery of agricultural commodities under the contract shall be reduced to the extent of the minimum total exchange value of the material not delivered with respect to which, by operation of this paragraph _(b), liquidated damages are not payable. Such reductions, however, shall not be applied to any quantity of the agricultural commodity for which the exchange value has been fixed pursuant to the contract.
Article XIII(f) provided:
Failure to Comply. The contractor shall pay to CCC as liquidated damages and not as a penalty a sum equal to that percentage (which 'percentage is specified in the contract as applicable to this Article XIII) of the exchange value of the agricultural commodity with respect to which the contractor does not comply with one or more of his export or transshipment obligations under the contract. Such liquidated damages shall not be paid, however, to the extent that, upon consideration of the cause and effect of any failure by the contractor to so comply, the Executive Vice President of Commodity Credit Corporation, or his designee, determines: (1) that such failure to comply was due solely to impossibility of performance of such obligations arising from causes without the fault of the contractor, including but not restricted to acts of government, acts of God, acts of the public enemy, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather, or (2) that such failure to comply was due to loss of or damage to the agricultural commodity or product in the course of exportation and the commodity or product, if so damaged, is not disposed of upon the domestic market *86 in such condition or manner as to tend to impair CCC’s. price support operation or (3) that such failure to com' ply was only one of delay without the fault of the contractor or his agents designated pursuant to the contract- or of his or their officers and employees or (4) that any-damage to CCC resulting from such failure to comply is. compensated for by the exportation by the contractor of' quantities of agricultural commodities in such manner-as to effect performance substantially equivalent to that required by the contract. Such liquidated damages shall be in addition to any upward adjustment in price for-which provision is made in the applicable Announcements by reason of the contractor’s failure to export as required therein and the contractor shall pay to CCC’ upon demand the amount of any such adjustment made-as a result of such failure.
Further, each of the contracts contained the following: provisions:
Section 3. Liquidated Damages.
a. Material. For the purpose of Article V of Form COC-111 the rate of liquidated damages payable by the contractor shall be one per cent of the exchange value-of any quantity of material which complies with all provisions of section 2.c. [the specifications of the industrial; diamonds] and which has been inspected and evaluated * * * and which has been neither rejected * * *' nor withdrawn by the contractor * * *
b. Agricultural Commodities. For the purpose of’ Article XIII (f) of Form CCC-111 the rate of liquidated damages payable by the contractor shall be seven and one-half per cent of the exchange value of any portion of the agricultural commodity which the contractor does not export * * *.
* * * * *
Section 5. Availability of Agricultural Commodities..
* * * * *
b. Quantity. The quantity of the agricultural commodity deliverable by CCC for application against the-contractor’s obligation to accept agricultural commodities under this contract shall be such as has a total exchange value equal to the exchange value of material delivered by the contractor, but not in excess of $ . * * *
c. Establishing Exchange Value.
(1) General. The contractor shall establish the exchange value of the agricultural commodity deliverable- *87 hereunder by acquiring it from CCC for application against this contract as hereinafter provided * * Acquisition shall be deemed to take place when the-contractor notifies the New Orleans CSS Commodity Office * * * that cotton having a specified value and', covered by an accepted bid is to be applied to this-contract. * * *
(2) Acquisition from, 088 Commodity Office. The-contractor shall acquire the agricultural commodity from the Commodity Office in accordance with Sales-Announcements issued by CCC and terms prescribed thereunder and within three (3) business days after-acceptance by CCC of a bid thereon notify the Commodity Office that the agricultural commodity acquired! is to be applied against this contract. * * * The exchange value of the agricultural commodity so acquired * * * shall be an amount equal to the contractor’s acquisition cost thereof under the Announcements had the agricultural commodity not been applied! against this contract. Acquisition cost, as the term is. used herein, shall not include any upward adjustment in» price by reason of the contractor’s failure to export as; required by the Announcements.
All except Parser’s contract 59-93 required the agricultural commodity to be exported by July 31, 1959. Similarly,, all except that contract specified cotton as the commodity to» be exported. Contract 59-93 merely referred to “agricultural commodities.”
The Rough Diamond contract was stated to have been executed on Rough Diamond’s behalf on September 30, 1959, and on CCC’s behalf on June 1, 1960.
The five Parser contracts were stated to have been executed on Parser’s behalf on September 28, 1959, and on CCC’s-behalf on June 1, 1960.
In each contract the “Quantity” of the agricultural commodity deliverable under Section 5.b. was set forth not to be-in excess of the following amounts:

*88 However, by a “Summary Statement” delivered to plaintiffs with respect to each contract on July 15,1960, CCC set forth the respective values of the diamonds and the cotton delivered to be as follows:

A 'bale normally consists of 500 pounds. There were thus 18,619,500 pounds of cotton (37,289 balesX50O) delivered by CCC to Rough Diamond in exchange for its diamonds, and 7,260,000 pounds of cotton (14,520 bales X 500) delivered to Parser in exchange for its diamonds.
55. On June 13, 1969, Rough Diamond, by its attorney, presented its claim to the Comptroller General, based on the contentions, among others, that it 'had been coerced into signing the final formal contract, and that it had “not received equivalent value in cotton because it was required to take down cotton at a minimum price arbitrarily fixed by CCC rather than at the competitive world price as provided in Section 203 of the Agricultural Act of 1956.” Rough Diamond offered to settle the controversy on the following basis:
In order to settle this dispute, we propose that the exchange value of the cotton be based on the competitive world price level during the April-July 1959 period so as to comply with the requirements of Section 203 of the Agricultural Act of 1956, as amended, and CCC’s commitment in their acceptance telegram to deliver cotton of equivalent value, and that the amount of cotton undelivered be determined on the following basis:
1. That the price of 6.71 cents per pound be agreed upon as the amount by which CCC over-evaluated the exchange value of the cotton thus far delivered, which *89 amounts to $38.55 per bale of 500 pounds, gross weight.
2. That the $33.55 per bale amount be multiplied by the 37,239 bales delivered by CCC during the April-July period to arrive at the total dollar amount by which the cotton delivered by CCC was over-evaluated.
3. That in view of CCC’s refusal to deliver the additional cotton necessary to equalize the value of the cotton with the value of the diamonds delivered by the Rough Diamond Company, you shall allow a dollar claim equal to the dollar amount by which CCC over-evaluated the cotton as determined under Item 2 above.
56. (a) By letter of July 8, 1960, to the Comptroller General, Congressman Harold D. Cooley, Chairman of the House Committee on Agriculture, stated that he understood “that there are several contracts which were entered into during the 1958-59 marketing year, in which the contractors have suffered substantial losses because of the failure of the Commodity Credit Corporation to price cotton competitively as required by” Section 203 of the Agricultural Act of 1956, and requested the Comptroller to “investigate this situation .and make certain that these contractors who cooperated with this government in the liquidation of our huge surpluses of .agricultural commodities were not victimized by an unfair .and unlawful export pricing policy.” He further requested the Comptroller to take “whatever action is necessary to make certain that these contractors receive equitable treatment.”
(b) By letter of August 24, 1960, the Comptroller General advised Congressman Cooley that “* * * we have taken the position that pi’ices at which CCC has made cotton available for export for the 1958-1959 marketing year have been maintained at levels in excess of competitive world prices, and that, this action, in our opinion, does not comply with the requirements of 7 U.S.C. 1853.” He further advised that his office was considering “a claim for additional compensation alleged to be due under a barter contract on account of the failure of the contractor to receive the equivalent value of cotton exchanged for industrial diamonds based upon the competitive world market price as provided in "7 U.S.C. 1853” and in such connection was considering whether barter transactions were included in such statute and *90 whether his office had any .jurisdiction over the claim in view of the provisions of the Commodity Credit Corporation Charter Act “respecting the finality and conclusiveness of claim settlements by CCC.”
(c) By letter of September 3, 1960, Congressman Cooley advised the Comptroller General that it was his opinion that “barter cotton is subject to the pricing'mandate of Section 203” but that if this were not so “the Department committed itself to deliver cotton of equivalent value'” and that “the Department cannot be permitted to arbitrarily price barter cotton for export in disregard of positive provisions of law, as well as in disregard of its contractual obligations to the barter contractors.” The letter further stated that he believed the Comptroller General had jurisdiction over the matter.
57. (a) By letter of November 22, 1960, the Assistant Comptroller General advised Congressman Cooley, among other things, that the Office of the Comptroller General had concluded that it had no jurisdiction to settle claims arising from CCC barter transactions because of “the applicability of the finality provision of 15 U.S.C. 714b (k) to barter transactions under 15 U.S.C. 714b(h) * * that the Office nevertheless was in disagreement “with the position of CCC that section 203 has no application to barter transactions” and that:
On the contrary, we feel that the equivalent value of the bartered surplus cotton should be determined under the pricing criteria of section 203, since to hold otherwise, would, in our opinion, be contrary to the intent of the Congress in enacting section 203. Our review of the instant barter transaction [i.e., the Rough Diamond transaction] lends support to that position since, for ah practical purposes, the surplus cotton was purchased by the claimant at the New Orleans Commodity Office under competitive bid procedures for application against the barter agreement. This finds substantial support in the document entitled “Transactions Prior to Signing of Barter Contracts” dated May 5, 1958;
that in Rough Diamond’s case, however, “the contractor voluntarily bid for the cotton at the prices which he saw fit to bid and acquired the cotton on such bid basis, thus fixing its. *91 exchange sale under the contract”; that section 203 authorizes CCC to accept bids in excess of the maximum prices specified therein; and that:
In summary, our conclusions are that this Office does not have jurisdiction to settle claims arising under barter transactions conducted by Commodity Credit Corporation under section 303 of the Agricultural Trade Development and Assistance Act of 1954, as amended. While we believe that such barter transactions come under the competitive pricing criteria of section 203 of the Agricultural Act of 1956, that act permits acceptance, under certain circumstances, of bids in excess of the maximum prices. Whether or not the contractor’s prices for cotton were in excess of the maximum under the terms of the barter agreement, his bid fixed the value of cotton for exchange purposes. Therefore, the present record, in our opinion, does not justify a different conclusion than that reached by CCC in its disposition of the claim of the contractor here involved.
(b) By letter of the same date, the Assistant Comptroller General also advised Rough Diamond’s attorney that, due to the provision in CCC’s Charter Act (15 U.S.C. 714b(j) and (k)) to the effect that the Corporation “shall have authority to make final and conclusive settlement and adjustment of any claims by or against the Corporation or the accounts of its fiscal officers,” the Comptroller General had no jurisdiction over the matter.
¡58. (a) The record does not show what were the acquisition costs to plaintiffs of the specific lots of industrial diamonds which they delivered to defendant. Industrial diamonds are normally purchased by dealers in bulk lots containing numerous “run of the mine” classes of diamonds and then mixed with other lots for sorting according to value, weight (i.e., number of carats), quality, and industrial use (gear grinding, drilling, precision instrument manufacture, etc.). They assume the nature of fungible goods. The exact cost of an individual diamond, therefore, becomes difficult or impossible to trace or establish. For this reason, plaintiffs were not able to establish the costs to them of the diamonds they delivered to defendant in connection with their barter transactions.
*92 (b) The record does not show the actual prices obtained for the sale of the cotton abroad made in connection with plaintiffs’ barter transactions. Due to the procedure of “selling” barter “rights” to cotton merchants, the fulfillment of the cotton phase of the transaction, i.e., its purchase from CCC, exportation, and resale in foreign countries, became, as between plaintiffs and the merchants, the responsibility of the merchants, who were not obliged to account to-plaintiffs regarding the prices they received for the sale of the exported cotton, or whether they exported the identical cotton they purchased from CCC.
59. As shown by finding 54, CCC delivered 18,619,500' pounds of cotton to Rough Diamond, and 7,260,000 pounds to Parser in exchange for the diamonds they delivered to CCC.
Plaintiffs claim that the prices they were obliged to pay to CCC for the cotton exceeded the prices prevailing in the foreign countries to which they were obliged to export cotton by 6.71 cents per pound.[8] Rough Diamond therefore* claims it was overcharged to the extent of $1,249,388.45 and Parser to the extent of $487,146.
CONCLUSION OK LAW
On the foregoing findings of fact, which are made a part' of the judgment herein, the court concludes as a matter of" law that plaintiffs are not entitled to recover, and their petition is dismissed.

 Although there Is no official publication giving the “world market price” of cotton, that phrase is frequently used in the trade as a short-hand reference to an average of prices in various foreign markets for one base type of cotton. Appropriate adjustments are made in pricing cottons of different quality and type. See finding 13.

 Both plaintiffs had accumulated large surplus diamond inventories^ amounting to millions of dollars.'

 Each plaintiff voluntarily selected cotton out of the list of CCC agricultural commodities which were available for barter.

 CSS, also a subagency of the Department of Agriculture, made the original diamond exchange offer on behalf of CCC and administered the sale of Its cotton.

 Tie statute reads in full: “Sec. 203. In furtherance of the current policy of the Commodity Credit Corporation of offering surplus agricultural commodities for sale for export at competitive world prices, the Commodity Credit Corporation is directed to use its existing powers and authorities immediately upon the enactment of this Act to encourage the export of cotton by offering to make cotton available at prices not in excess of the level of prices at which cottons of comparable qualities are being offered in substantial quantity by other exporting countries and, in any event, for the cotton marketing year beginning August 1, 1956, at prices not in excess of the minimum prices (plus carrying charges, beginning October 1, 1956, as established pursuant to Section 407 of the Agricultural Act of 1949) at which cottons of comparable qualities were sold under the export program announced by the united States Department of Agriculture on August 12, 1955. The Commodity Credit Corporation may accept bids in excess of the maximum prices specified herein but shall not reject bids at such maximum prices unless a higher bid is received for the same cotton. Cottons of qualities not comparable to those of cottons sold under the program announced on August 12, 1955, shall be offered at prices not in excess of the maximum prices prescribed hereunder for cottons of qualities comparable to those cottons sold under such program, with appropriate adjustment for differences in quality. Such quantities of cotton shall be sold as will reestablish and maintain the fair historical share of the world market for united States cotton, said volume to be determined by the Secretary of Agriculture.”

 A provision like Section 203 Rad been added by the Senate to an earlier agricultural measure passed in 1956 (H.R. 12), but was deleted by the conference committee. 102 Cong. Rec. 6124. This bill was vetoed and never became law. 102 Cong. Rec. 8347.

 The proviso was subsequently revised and readopted, at the request of the Agriculture Department, to read as It now does. 102 Cong. Rec. 8502-03.

 In an analysis of the proposed Section 203, Senator Eastland also pointed out that the provision did not “preclude the Commodity Credit Corporation from accepting the higher of several bids for the same particular lot of cotton above the [August 12, 1955] price.” 102 Cong. Rec. 8485.

 Senator Eastland agreed that the statement of the Managers on the part of the House reflected the position of both branches of the Congress. 102 Cong. Rec. 8678.

 We say nothing, because it is not before us, on the related but separate issue of whether plaintiffs would have had sufficient standing to sue in 1959 for mandatory or injunctive relief compelling the Secretary of Agriculture to offer the cotton to them at the world price.

 In South Puerto Rico Sugar Company Trading Corp. v. United States, 167 Ct. Cl. 236, 334 F. 2d 622 (1964), cert. denied, 379 U.S. 964 (1965), the plaintiff was one of the group intended to be benefited directly by the portion of the statute on which it relied; in addition, true business compulsion was also found to be present.

 CCC’s telegram of March 16th to Rough Diamond “accepted” that firm’s offer to barter surplus diamonds valued at $4,740,000. The acceptance telegram sent to Parser on the same day pertained to only two of its four bids. Parser’s remaining offers were accepted by CCC in April and May 1959, bringing the total value of the diamonds exchanged by that company to $1,870,000.

 Though the Informal agreement tvas “subject to the execution by the parties of a mutually agreeable contract containing all of the terms and conditions,” that did not alter its binding effect.

 A bilateral transaction, as defined by tbe Departmental Press Release of November 14, 1958, referred to in CCC’s invitation, was “one under which the agricultural commodity moves to the same country from which the material comes.” The press release stated in part that “Foreign-produced materials acquired under barter may be processed in the U.S.” under a “bilateral type” barter transaction when “an exchange value of the agricultural commodity approximately equal to the exchange value of the processed materials being acquired will be exported to the source country of the raw material involved * *

 Several industrial diamond barterers selected other agricultural commodities.

 The making of periodic adjustments in the cotton subsidy to keep American cotton competitive in -world markets on a day-to-day basis was a debatable point, as is shown by the following excerpt from a House Agriculture Committee Report, dated January 25, 1960, on “The Competitive Position of United States Agricultural Products in the Hard Currency Countries of Western Europe”:
Price and the uncertainty of government policies are apparently the No. 1 handicap to the united States maintaining its competitive position in cotton exports to Europe. In the marketing year 1958-59, American cotton was priced 5 to 7 cents above the world market. This was a result of the action of the Department of Agriculture in establishing the export subsidy. In the current marketing year, a more realistic export subsidy has been established and U.S. cotton is more nearly competitive in European markets. Most of those to whom the group talked in Europe, however, felt that the cotton subsidy should be established on a day-to *44 day basis, as to the case of grains, rather than on a preannonnced established price. Since virtually every other cotton-producing country operates its export programs with some type of governmental subsidy or assistance, it is hard to understand why the united States should not adopt the policy of making its cotton competitive with all other cotton on world markets on a day-to-day basis.

 Cotton in the price support program was classed in seven basic grades and five intermediate grades. It was further described or classified by color factors and staple lengths. These factors affected the value of any give» bale of cotton. For example, since white cotton classed in the higher grades of the longer staple lengths was more valuable than spotted or tinged cotton in the lower grades and short staple lengths, a range of prices and values was applicable to the cotton to Commodity Credit Corporation’s inventory. Furthermore, there are some 400 different intermixtures of grades, qualities, and staple lengths of cotton, all of which served to affect the priee at which any particular bale of cotton would be sold. Various prices were therefore bid for different lots determined by the quality of the cotton therein, its location, and other factors. However, by the application of appropriate premiums and discounts for the various factors involved, all such bids could be compared with a base price. Such quality discounts and premiums did not remain constant but varied from time to time depending upon the crop and availability of various qualities of cotton as related to the demand therefor.

 In its sales in New Orleans for export, the average price upon which CCC’s cotton was based was on middling 1-inch at average locations. It was on this basis that CCC’s floor price of 28.30 cents per pound was established. All other grades were adjusted against the base price.

 As was stated in a circular issued by the Foreign Agricultural Service, USDA, on November 18; 1959 (No. 15-59) under the heading “U.S. 1959-60 Cotton Export Prospects Favorable”:

U.S. Export Prices Lowered to Competitive-Level:.

Reduction in the 1959-60 domestic .price support rate plus the 1% cexits-per-pound increase in the export payment rate had the effect of reducing the U.S. export price this season approximately 5 cents a pound from last, season.. .In effect, the U.S. price was reduced to levels at which major competitive growths'were selling several months before the start of- the 1959-60 season.
And as had been similarly testified by the Assistant .Secretary, of Agriculture on July 14, 1959, before the.House Committee on Agriculture,.8,6th Congress, First Session (Serial X):
Mr. Miller. First, Mr. Chairman, .1 should like to- point out that 51 percent loss in exports, ....
We continued in the marketing- year just ended the same policy that ve had established under which we had sold these sizable quantities in the years previous, but we found that about midway or two-dhirds of the way through the marketing year) other countries had'reduced the price of their cotton below that which we had. priced-ours and pold this quantity of cotton which I think represents these percentages of increases which you have just enumerated.
When that became evident, we did not alter our export sales policy at .that time, but we announced on February 1 or approximately February 1, that, at the beginning of the marketing season; we would reduce the price of cotton or increase the subsidy, whichever' way you might term it; to-a point where we would become competitive beginning August 1, and we -would thereafter alter’ our export sales policy to enable us to competitively price cotton by reviewing periodically, every SO days, the -world price of -cotton.

 In accordance with the paragraph designated 9(d) in CCC’s December 24, 1958 invitation (finding 2), plaintiffs had submitted to¡ CCC the irrevocable letters of credit therein required.

 However, at the trial their expert testified that the world price averaged 5.86 cents per pound below CCC’s 28.30-cent floor price.